**Affirmed in Part, Reversed and Remanded in Part, and Majority and Dissenting Opinions filed June 30, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-01112-CV

---

### DAVIS-LYNCH, INC., Appellant

### V.

### ASGARD TECHNOLOGIES, LLC, MANGROVE, INC., TALENT FORCE, INC., PHOENIX OFFSHORE SERVICES, L.L.C., TALENT FORCE TECHNICAL, L.L.C., ASGARD RESOURCES, LLC, ASGARD RESOURCES OF TEXAS, L.L.C., AND ARTHUR P. GRIDER, Appellees

---

**On Appeal from the 334th District Court
Harris County, Texas
Trial Court Cause No. 2011-10745**

---

## M A J O R I T Y   O P I N I O N

A staffing company placed a worker, later discovered to have a criminal history of theft, in a receptionist position at Davis-Lynch, Inc. (DLI). DLI later promoted the worker to head of accounting, and she embezzled millions of dollars. In two issues, DLI challenges the trial court's grant of summary judgment in favor

of appellees Asgard Technologies, LLC; Mangrove, Inc.; Talent Force, Inc.; Phoenix Offshore Services, L.L.C.; Talent Force Technical, L.L.C.; Asgard Resources, LLC; Asgard Resources of Texas, L.L.C.; and Arthur P. Grider (collectively, Asgard). Concluding that DLI raised a genuine issue of material fact regarding whether Asgard knew or should have known that, because of its acts of retaining the employee from year to year without disclosing her criminal record to DLI, the crime (or one like it) might occur, we reverse the trial court's judgment as to DLI's negligent retention claim and remand that issue to the trial court for proceedings consistent with our opinion. We affirm the trial court's judgment in all other respects.

## *Background*

DLI is an oilfield manufacturing company. Pendragon Holding, Inc., Asgard's predecessor, was a staffing company. In 1986, DLI and Pendragon entered into a "Technical and Manufacturing Services Agreement." The term of the agreement was for one year, but could be extended by mutual consent. Subsequent agreements were entered into between Asgard and DLI under substantially similar terms, with Asgard assuming the responsibilities of Pendragon. We refer to all relevant versions of these agreements as "the Agreement."

DLI outsourced its staffing and certain aspects of its management needs. Asgard or its predecessors provided personnel to DLI "to cover management, liaison, administrative, technical, maintenance, housekeeping, and clerical requirements." As set forth in the Agreement, Asgard had continuing responsibilities to supervise personnel it placed at DLI and to supervise and operate certain departments at DLI. The personnel placed at DLI by Asgard continued to be Asgard employees even though they worked at (and under the

direction of) DLI. In addition, Asgard provided a program manager "responsible for ensuring that operational, technical, and administrative . . . requirements are satisfactorily performed." The program manager supervised all personnel placed by Asgard at DLI "in the performance of [Agreement] requirements." Although DLI directly employed its upper management, Asgard was also to provide certain human resources functions.

Pendragon placed Nancy Moreno at DLI as a receptionist.[1] In accordance with the staffing arrangement described above, Moreno, at all relevant times, was an employee of Asgard or one of its predecessors. Two years later, DLI promoted Moreno to accounting clerk. Moreno was supervised by Thurman Northam. Northam was injured in a car accident and could not return to work. DLI's president, Carl Davis, and vice president, Frank Cole, promoted Moreno to head of accounting. Moreno hired several personnel to work in the accounting department, including close relatives. She had access to financial records; was responsible for accounts payable, accounts receivable, preparation of checks, assembling of invoices for approval by Davis; and had access to company credit cards.

Approximately eight years after Moreno's promotion to head of accounting, DLI discovered that Moreno had arranged for a DLI copy machine to be delivered to her son's place of business. DLI terminated Moreno's employment and then discovered that Moreno had embezzled over $15 million from DLI while she was working in the accounting department. DLI also learned that Moreno had been placed on deferred adjudication in 1995 for misdemeanor theft and convicted of another misdemeanor theft in 1999.

---

[1] Bill Kelley, DLI's manager of operations, testified that Moreno was originally placed in DLI's international department as an administrative assistant but then transferred to reception. It is unclear from the record whether Asgard or DLI transferred her. Because both parties refer to Moreno's initial placement as a receptionist and because it does not alter our analysis, we also refer to her job as receptionist.

DLI sued Asgard, bringing claims for negligence, breach of fiduciary duty, and breach of contract and seeking damages of $15 million. Additional theories of liability included respondeat superior and the individual liability of appellee Arthur P. Grider.

Asgard filed separate traditional and no-evidence motions for summary judgment on similar grounds, contending that Asgard was not negligent in hiring or retaining Moreno because it had no duty to perform criminal background checks under the Agreement or Texas common law, Moreno's actions were not foreseeable, Asgard was not negligent in supervising Moreno, Asgard's actions were not the proximate cause of DLI's damages, there was no breach of contract, Asgard did not breach any fiduciary duty to DLI, and Grider was not individually liable for any alleged wrongdoing of the staffing companies.[2] Asgard also argued the affirmative defenses of quasi-estoppel, waiver, limitations, and laches precluded its liability.

DLI responded and moved to strike Grider's affidavit, which was part of Asgard's summary judgment evidence.[3] The trial court denied the motion to strike, granted the traditional motion for summary judgment, and denied the no-evidence motion.[4] Asgard subsequently filed a combined traditional and no-evidence motion

---

[2] DLI argues that other employees also were involved in the embezzlement scheme. All alleged embezzlers who were employees of Asgard sometimes are referred to herein as "Moreno."

[3] On appeal, DLI argues, without citing any authority, that the trial court erred in denying DLI's motion to strike Grider's affidavit because the affidavit was not based on personal knowledge, was based on hearsay, and contained legal conclusions. DLI reurges on appeal its motion to strike, but neither objected below nor objects on appeal to Grider's authentication of documents attached to his affidavit. To the extent that DLI has properly raised an appellate issue complaining of the trial court's denial of the motion to strike, we do not rely on the portions of the Grider affidavit to which DLI objected in analyzing whether the trial court erred in granting the motion for summary judgment. Thus, we need not reach the issue.

[4] DLI filed a motion for reconsideration and request to enlarge the summary judgment

4

for summary judgment on DLI's respondeat superior claim. The trial court granted that motion without specifying the grounds.

## *Discussion*

In two issues, DLI contends that the trial court erred in granting Asgard's motions for summary judgment. In its first issue, DLI complains that the trial court erred in granting Asgard's traditional motion and denying DLI's motion for reconsideration of the traditional motion because (1) Asgard owed it a fiduciary duty to discover and disclose material facts concerning the criminal backgrounds of Asgard employees placed at DLI; (2) Asgard breached the Agreement by failing to perform background checks; (3) Asgard was negligent in hiring and retaining Moreno; and (4) Grider is an alter ego of Asgard and thus personally liable. In its second issue, DLI argues the trial court erred in granting Asgard's no-evidence motion on the respondeat superior claim because Asgard, as Moreno's employer, was liable for her actions.

We review de novo the trial court's grant of summary judgment. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). In a traditional motion for summary judgment, the movant has the burden of establishing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Id*. (citing Tex. R. Civ. P. 166a(c)). The nonmovant has no burden to respond to or present evidence regarding the motion until the movant has carried its burden to conclusively

---

record. Nothing in the record indicates that the trial judge considered the supplemental evidence (Exhibit 12), so we do not consider it on appeal. *See Auten v. DJ Clark, Inc.*, 209 S.W.3d 695, 702 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("A trial court may accept summary judgment evidence filed late, even after summary judgment, as long as the court affirmatively indicates in the record that it accepted *or considered* the evidence."); *see also Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex. 1996) (recognizing that, unless the record affirmatively indicates trial court permitted the late filing of summary judgment evidence, the appellate court must presume the trial court did not consider the late-filed evidence).

establish the cause of action or defense on which its motion is based. *State v. $90,235*, 390 S.W.3d 289, 292 (Tex. 2013). We consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848.

The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). When, as in this case, the order granting summary judgment does not specify the grounds upon which the trial court relied, we must affirm the summary judgment if any of the independent summary-judgment grounds is meritorious. *$90,235*, 390 S.W.3d at 292.

When a trial court grants a summary judgment on both no-evidence and traditional grounds, we usually address the no-evidence grounds first. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *PAS, Inc. v. Engel*, 350 S.W.3d 602, 607 (Tex. App.—Houston [14th Dist.] 2011, no pet.). However, if we conclude that we must affirm the trial court's summary judgment ruling on traditional grounds, we need not review the no-evidence grounds. *See Wilkinson v. USAA Fed. Sav. Bank Trust Servs*., No. 14-13-00111-CV, 2014 WL 3002400, at *5 (Tex. App.—Houston [14th Dist.] Jul. 1, 2014, pet. denied) (mem. op.); *see also* Tex. R. App. P. 47.1.

## I.    No Fiduciary Duty

DLI argues Asgard owed fiduciary duties to conduct criminal background checks on Asgard employees placed at DLI, report the results to DLI, supervise those Asgard employees, "assure trustworthy personnel were assigned to" DLI, and indemnify DLI for its losses resulting from Moreno's embezzlement.

6

According to DLI, these duties arose out of (1) an agency relationship between Asgard and DLI created by the Agreement, and (2) Asgard's employer-employee relationship with Moreno.[5]

Breach of fiduciary duty requires proof of (1) a fiduciary relationship between plaintiff and defendant, (2) breach of the fiduciary duty, and (3) damages arising from the breach, either injury to the plaintiff or benefit to defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Due to its extraordinary nature, the law does not recognize a fiduciary relationship lightly. *See Willis v. Donnelly*, 199 S.W.3d 262, 278 (Tex. 2006); *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet. denied). Whether such a duty exists depends on the circumstances. *Hoggett*, 971 S.W.2d at 488.

**No Agency-Principal Relationship Giving Rise to Formal Fiduciary Duties**. DLI argues the Agreement created an agency-principal relationship between DLI and Asgard. The Agreement reads as follows:

> [Asgard] is hired as an independent contractor, and . . . nothing herein is intended to nor shall create the relationship of employee, partner, joint venture or associate, *or any other relationship* between DLI and [Asgard], except that of principal and independent contractor.

(Emphasis added). Despite the plain language of the Agreement, in which the parties described their relationship as that of "principal and independent

---

[5] In its traditional motion for summary judgment, Asgard generally argued that it did not breach any fiduciary duty and no fiduciary relationship existed between Asgard and DLI or between Grider and DLI. In its response, DLI generally argued that (1) the relationship between DLI and Asgard was one of trust and confidence, (2) a relationship of trust and confidence was created between the parties based on contractual duties that would expose placed Asgard employees to certain of DLI's confidential information, and (3) the Agreement's use of the word "principal" created a principal/agent fiduciary relationship. In its motion for reconsideration, DLI reiterated that a material fact exists as to whether the parties had a special relationship that rose to the level of a fiduciary relationship.

contractor," DLI asserts that the use of the word "principal" indicates a principal-agent relationship exists between the two, which in turn created a fiduciary relationship between them.

An agency relationship arises when the principal consents to the agent acting on the principal's behalf. *See Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Essential to the principal-agent relationship is the principal's right to control the acts of the alleged agent. *Id.*; *see also Hand v. Dean Witter Reynolds, Inc.*, 889 S.W.2d 483, 493 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (acknowledging that to be an agent the principal must control the agent's actions and manifest consent to the agent acting on the principal's behalf). The principal-agent relationship may be created through actual or apparent authority. *See CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.*, 222 S.W.3d 889, 899 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Agency is the type of special relationship that gives rise to a fiduciary duty. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002).

Here, the Agreement required Asgard, an independent contractor, to place Asgard employees in DLI facilities. We look to the substance of the Agreement in determining the exact nature of the relationship. *See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 702-03 (Tex. 2007). Despite using the word principal to describe DLI, Asgard is defined clearly in the Agreement as an "independent contractor," not an agent. *See id.* at 703 (declining to impose general fiduciary duty when agreement provided for "independent contractor" status). Executing the Agreement was an arms' length business transaction between two sophisticated parties. *See id.* The parties themselves defined the parameters of their respective roles, and if they had intended to create a principal-agent relationship, they could have done so expressly. *See id.* We decline to impose a general

8

fiduciary duty on Asgard in light of the plain language of the Agreement.[6] *See id*.

**No Informal Fiduciary Relationship Created**. DLI also argues that Asgard owed DLI a fiduciary duty to provide it with trustworthy employees, presumably because DLI and Asgard had a relationship of trust and confidence.[7] An informal fiduciary duty may arise from certain relationships of trust and confidence. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). However, "[i]t is well settled that not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Id*. at 330 (citation omitted).

Informal fiduciary duties are not owed in business transactions unless the special relationship of trust and confidence existed prior to, and apart from, the transaction at issue in the case. *Id*. at 331. As the supreme court has held, "[M]ere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997)).

We conclude that no special relationship giving rise to a fiduciary duty was created under the circumstances of this case. We reached the same conclusion in *Dodson v. Kung*, 717 S.W.2d 385 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Dodson and Kung met when Dodson was an employee at Kung's golf club, and the two developed a mentor-mentee relationship. *Id*. at 387. Some years later, Dodson went to work for Kung's company, and when a dispute arose,

---

[6] DLI also argues that Asgard's access to confidential information belonging to DLI created a principal-agent relationship. DLI does not elaborate on how access to confidential information, standing alone, could create such a relationship. Asgard contractually agreed to keep such information confidential. We decline to impose an additional fiduciary duty on Asgard based on its access to DLI's information.

[7] DLI argued below that it and Asgard had a relationship of trust and confidence.

9

Dodson sued, claiming a breach of an informal fiduciary duty. *Id*. The trial court rendered summary judgment against Dodson on that issue, and we affirmed. *Id*. While acknowledging that the relationship was one of business and friendship and that Kung "was in a superior position because of his wealth and business experience," we observed that Dodson "was a grown man with considerable business sense." *Id*. at 389. Most importantly, there was "no evidence that these men were not dealing at arm[']s length and on equal terms." *Id*. Accordingly, we held that no fact issue had been raised as to breach of a fiduciary duty. *Id*.

Here, DLI had contracted with Asgard and its predecessors to obtain staffing for more than a decade. As in *Dodson*, there is no evidence that these parties were operating on any basis other than an arm's length relationship and on equal terms. *See id*. There are, therefore, no genuine issues of material fact as to the creation of an informal fiduciary relationship or, as a result, breach of fiduciary duty.

We conclude that Asgard conclusively established it owed no fiduciary duties to DLI, either formal or informal.

## II.    No Breach of Contract

As an initial matter, we must decide whether—as DLI contends—Asgard's traditional motion for summary judgment was too narrow to encompass DLI's breach of contract claim, as amended. DLI amended its petition after Asgard filed its motion. The amendment included DLI's claims that Asgard (1) failed to investigate employees; (2) placed employees at DLI with criminal backgrounds; (3) failed to disclose such oversights; and (4) failed to indemnify DLI for the losses Moreno caused.

We conclude that these amendments were encompassed by Asgard's motion. DLI's "failure to investigate" allegation is a restatement of its "failure to perform background check" claim, which was addressed fully in Asgard's motion. The

10

same is true with respect to DLI's contention regarding indemnity. As expressly set forth in the indemnity agreement, Asgard's indemnity obligation arises only to the extent of Asgard's negligence, which argument was raised and developed.[8] *See ConocoPhillips Co. v. Noble Energy, Inc.*, No. 14-13-00884-CV, 2015 WL 1456444, at *7 (Tex. App.—Houston [14th Dist.] Mar. 26, 2015, no. pet. h.) (acknowledging courts interpret contracts in light of parties' intentions as expressed in the instrument and construe indemnity agreements under normal rules of contract construction). Finally, DLI's "failure to disclose" claim was encompassed in the portion of Asgard's motion addressing whether Asgard owed a duty to conduct criminal background checks. Accordingly, the trial court did not grant more relief than Asgard requested. *See Wortham v. Dow Chem. Co.*, 179 S.W.3d 189, 202 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (concluding motion was broad and directed to evidence of duty owed or breached, so that later-filed claims were addressed) (citing *Lampasas v. Spring Ctr., Inc.*, 988 S.W.2d 428, 436-37 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding when amended petition merely reiterated essential elements in different form, the motion applied to the changed pleading)).

DLI argues that the Agreement required Asgard to perform background checks and that Asgard breached that contractual duty. The construction of an unambiguous contract presents a question of law that we review de novo.[9] *Tawes v.*

---

[8] The indemnity provision reads as follows:

[Asgard] agrees to indemnify, hold harmless and defend DLI . . . from all claims . . . arising out of or relating from [sic] employees of [Asgard] or [Asgard's] fraud, negligence or malfeasance and which occur during [Asgard's] performance under this contract. [Asgard] will only indemnify DLI to the extent of [Asgard's] negligence.

[9] Neither party argues that the Agreement is ambiguous. However, they have conflicting views regarding whether the Agreement required Asgard to perform background checks on the employees it placed at DLI.

11

*Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *ConocoPhillips*, 2015 WL 1456444, at *7. Our primary concern in interpreting a contract is to ascertain and give effect to the intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We examine and consider the entire writing in an effort to harmonize and give effect to all provisions of the contract, so that none will be rendered meaningless. *J.M. Davidson*, 128 S.W.3d at 229.

DLI argues the following requirements imposed on Asgard in the Agreement created a duty for Asgard to perform background checks on its employees: (1) "provid[ing] adequate staff to meet production quotas and other requirements established by [DLI]"; (2) "provid[ing] the necessary personnel to cover management, liaison, administrative, technical, maintenance, housekeeping, and clerical requirements"; (3) providing logistic support; (4) maintaining accurate records, abiding by DLI's policies, maintaining confidentiality, complying with the manufacturing license, and protecting patents; (5) providing a program manager responsible for ensuring "that operational, technical, and administrative contract requirements are satisfactorily performed" through supervision of personnel, liaising with DLI, and managing and administering logistic support; and (6) indemnifying DLI to the extent of Asgard's negligence.[10]

The plain language of the Agreement does not require Asgard to perform

---

[10] As set forth above, we construe indemnity agreements under normal rules of contract construction. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000); *ConocoPhillips*, 2015 WL 1456444, at *7. DLI asserts that the "claim for indemnity based on a breach of fiduciary duty arises from the 'agent-principal' relationship that was formed by the [Agreement]." As we have held there is no agent-principal relationship, DLI's argument regarding the indemnity agreement is without merit.

12

background checks. The Agreement was negotiated at arm's length between sophisticated parties. *See FPL Energy, LLC v. TXU Portfolio Mgmt. Co.,* 426 S.W.3d 59, 67 (Tex. 2014) ("[S]ophisticated parties have broad latitude in defining the terms of their business relationship."). If the parties had envisioned a background check requirement, they easily could have included it in the plain language of the Agreement. *See id.* ("We must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract."). They did not do so here. We decline to read such a provision into the Agreement. *See id.* at 67-68 (noting parties strike the deal they choose to strike and bind themselves in the manner they choose and concluding parties' omission of reference to energy in liquidated damages provision of contract was critical) (citing *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We have long held that courts will not rewrite agreements to insert provisions parties could have included.")). Asgard has conclusively established that under the unambiguous terms of the Agreement, it did not have a contractual duty to perform background checks.

## III. Negligence

DLI argues that Asgard had duties to "hire, supervise, and retain competent employees who [were] fit for the work they perform[ed]" and use ordinary care in retaining Moreno and ensuring that the individuals Asgard placed at DLI were "not thieves." A negligence claim requires proof of circumstances giving rise to a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by that breach. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001); *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 287 (Tex. App.—Dallas 2015, no. pet. h.). Negligent hiring, supervision, and retention claims focus on the employer's own negligence, not the negligence of the employee.

13

*Clark*, 455 S.W.3d at 287. An employer can be liable for negligence if its failure to use due care in hiring, supervising, or retaining an employee creates an unreasonable risk of harm to others. *Id*.

Although the supreme court has yet to set out what duty an employer has in negligent hiring or supervision claims, it has indicated that to recover on these theories, a plaintiff must show more than just negligent hiring practices.[11] *Wansey v. Hole*, 379 S.W.3d 246, 247 (Tex. 2012) (per curiam). The plaintiff also must show it "suffer[ed] some damages from the foreseeable misconduct of an employee" who was hired, supervised or retained pursuant to the defendant's negligent practices. *Id*.

Duty is a question of law for the court to decide based upon facts surrounding the occurrence in question. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). In determining whether a duty exists, a court is to consider several interrelated factors such as: (1) the risk involved; (2) foreseeability of the risk; (3) likelihood of injury; and (4) the social utility of the actor's conduct and the magnitude of the burden on the defendant. *See id*. Of all the factors considered, foreseeability of the risk is the foremost and dominant consideration. *Id*. Foreseeability means that a person of ordinary intelligence should have anticipated the dangers that his negligent act created for others. *Missouri Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 103 (Tex. 1977).

As a general rule, "a person has no legal duty to protect another from the criminal acts of a third person." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998). This is because the criminal conduct of a third party is a superseding cause that extinguishes any liability of the previous actor.

---

[11] "We have not ruled definitively on the existence, elements, and scope of such torts and related torts such as negligent training and hiring." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010).

14

*See Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999). However, if a criminal's conduct is a foreseeable result of the prior negligence of a party, the criminal act may not excuse that party's liability. *See id*. To impose liability on a defendant for negligence in failing to prevent the criminal conduct of another, the facts must show more than conduct that creates an opportunity to commit crime— they must show both that the defendant committed negligent acts and that it knew or should have known that, because of its acts, the crime (or one like it) might occur. *Barton v. Whataburger*, 276 S.W.3d 456, 462 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Thus, for a legal duty to prevent the criminal conduct of **another to arise**, the crime must have been reasonably foreseeable at the time the defendant engaged in negligent conduct. Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others. *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex. 2002). A danger is foreseeable if its general character might reasonably be anticipated, if not its precise manner. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex. 1992).

Determining whether a legal duty exists, including the foreseeability element, is typically a legal question. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002); *Salinas v. Briggs Ranches*, 350 S.W.3d 218, 226 (Tex. App.—San Antonio 2011, no pet.). However, if the essential facts about foreseeability as an element of the defendant's duty are disputed, the question is a fact issue for the jury. *Williams*, 85 S.W.3d at 166. Evidence is disputed when it "does not conclusively establish the pertinent facts or the reasonable inferences to be drawn" from those facts. *Id*.

DLI cited a laundry list of allegedly negligent acts in its live petition. Certain of these revolve around the failure of Asgard to perform a background check on Moreno: negligent hiring, retention, investigation and screening, failure to discover

15

criminal background, failure to run background checks, failure to disclose "suspicions," and failure to disclose criminal background. Other allegedly negligent acts include failure "to implement proper policies, procedures, and protocols to . . . manage . . . and evaluate the Program Manager and other employees put in positions of control and importance at [DLI]" and "failure to properly manage and supervise."

In its traditional motion for summary judgment, Asgard argued generally that it was not foreseeable that Moreno, a receptionist, would become head of DLI's accounting department and engage in a high-dollar embezzlement scheme. Asgard also argued that the Agreement did not require background checks and none of the named defendants hired Moreno (rather, Moreno was hired by Pendragon, a Grider company but not a named defendant). As to negligent supervision, Asgard argued that the Agreement specified certain departments that Asgard was to supervise and that the accounting department, where Moreno worked when the embezzlement occurred, was not listed. With regard to negligent hiring and retention, Asgard contended that (1) it did not hire Moreno or have a duty to perform a background check on her; (2) DLI's promotion of Moreno to head of accounting and her embezzlement were not reasonably foreseeable to Asgard; and (3) DLI did not perform background checks on its employees. Further, Asgard asserted Moreno was not subject to Asgard's control and DLI prevented Asgard from supervising Moreno.

In its response, DLI argued that Asgard was required to conduct background checks by custom and by common law and because of the special relationship between the companies. DLI also argued that Asgard admitted that, after 2002, it undertook to run background checks on all employees staffed at DLI and it learned of Moreno's theft conviction while she was employed by Asgard but did not notify DLI.

16

**No Duty to Manage and Supervise**. Asgard was required under the Agreement to supervise its employees and has conceded that it did not supervise Moreno in her position as head of accounting. However, Asgard presented uncontroverted evidence that it had no duty to supervise Moreno *in the accounting department* because (1) the list of departments specified in the Agreement which Asgard was required to supervise did not include the accounting department; (2) accounting personnel were not under Asgard's control; and (3) DLI prohibited Asgard from supervising accounting personnel.

Asgard submitted DLI president Carl Davis's deposition in support of the motion. Davis testified that Frank Cole, DLI's vice president, transferred Moreno to the accounting department. At that time, Moreno reported to Thurman Northam. When Northam left DLI, Davis and Cole promoted Moreno to Northam's position.[12] Moreno then reported primarily to Cole.[13] Davis, Cole, and others at DLI gave Moreno her job assignments in the accounting department. Asgard did not have access to DLI's financial statements or reports, checks or supporting documents prepared by Moreno for DLI's accounting department, DLI's accounting system, or vendor invoices and supporting documentation handled by the accounting department. Davis also testified that he did not know how Asgard could supervise Moreno in light of Asgard's lack of access to the accounting records. Davis conceded that the only way for Asgard to supervise Moreno would be if DLI complained about her job performance. DLI presented evidence that Tom Grider, Asgard's program manager, knew Moreno was doing some accounting

---

[12] Before Northam left DLI, he and Moreno had been the only employees in the accounting department. Northam did not have a job title. The department eventually grew, and Moreno's title became accounting department supervisor.

[13] Davis was asked in his deposition, "When Ms. Moreno became the Accounting Supervisor, who did she report to?" Davis responded, "Well, she was an Asgard employee, but she probably answered a little bit more to Mr. Cole."

17

work, but did not present evidence that Asgard was required to supervise that work.

We conclude Asgard conclusively established it had no duty to manage and supervise Moreno after she was transferred to the accounting department.

**Negligent Hiring and Retention**. As to the duty to perform a criminal background check, both parties cite *Wise v. Complete Staffing Servs., Inc.,* 56 S.W.3d 900 (Tex. App.—Texarkana 2001, no pet.). Wise, an employee of Mrs. Baird's Bakery, was attacked and severely injured by a temporary worker employed by a staffing company and placed at Mrs. Baird's as an unskilled laborer. *Id*. at 901. Wise alleged that the staffing company was negligent and grossly negligent in employing the temporary worker because it did not sufficiently investigate his criminal background and that the staffing company had a "special relationship" with the temporary worker and failed to adequately supervise his activities and adequately check his credentials. *Id*. Wise also alleged that because of its special relationship with the temporary worker, the staffing company had a duty to discover and warn Mrs. Baird's about the temporary worker's criminal background. *Id*. The staffing company moved for summary judgment, contending that under the facts alleged by Wise, it had no general duty to seek or obtain criminal records of its employees, no special circumstance existed that would impose any heightened level of duty on it, and there was no evidence that it assumed such a duty. *Id*. at 901-02.

The *Wise* court analyzed whether the temporary worker was placed in a situation that foreseeably created a risk of harm to others because of his employment duties. *Id*. at 903. The court noted that the case was unlike *Arrington's Estate v. Fields,* 578 S.W.2d 173, 178 (Tex. Civ. App.—Tyler 1979, writ ref'd n.r.e.), in which an employer was found liable for negligently hiring someone as a security guard when he had a long criminal record, as it was

18

foreseeable that a customer might be harmed by an armed employee performing a hazardous job. *Wise*, 56 S.W.3d at 903. The *Wise* court concluded that its facts were closer to *Guidry v. National Freight, Inc.*, 944 S.W.2d 807, 811-12 (Tex. App.—Austin 1997, no writ), in which a truck driver sexually assaulted a third party and the court held such "bad acts" to be unforeseeable. *Wise*, 56 S.W.3d at 903. The employer's duty in *Guidry* did not extend to investigating non-vehicular criminal backgrounds. *Wise*, 56 S.W.3d at 903. The *Wise* court held that, similarly, the temporary worker did not injure Wise as a result of incompetence or unfitness for the job, but by an intervening criminal act and the staffing company had no duty to check the criminal histories of its employees unless it was directly related to the duties of the job at hand. *Id*.

Applying the *Wise* court's analysis here, the embezzlement scheme was clearly an intervening criminal act; however, it cannot lightly be said that Moreno's criminal history was not directly related to the duties of the job "at hand," which was head of accounting, when the "bad acts" occurred. What is remarkable in this case is Moreno's promotion from receptionist to head of accounting. Had she remained in the position where she was placed by Asgard, she would not have been in a situation that foreseeably created a risk of harm to others because of her employment duties. *See id*.

We conclude that, considering the facts surrounding Asgard's hiring and placement of Moreno, Asgard had no duty to perform a background check. The facts do not show that Asgard knew or should have known that, because of its acts of hiring and placing Moreno without performing a background check, the crime (or one like it) might occur.

Asgard, however, did not conclusively establish that the circumstances foreclosed any duty to DLI regarding the retention of Moreno after Asgard became

19

aware of her criminal history of theft.[14] Grider testified that he began running criminal checks on new employees "sometime in 2002." He also testified that he became aware of Moreno's criminal history during her employment with DLI; Asgard, however, did not disclose this information. DLI argues that Asgard knew about Moreno's promotion to the accounting department based on Tom Grider's testimony that he knew Moreno "helped" Northam in accounting for a couple of years. Asgard's post-hiring but undisclosed knowledge of Moreno's criminal theft history, combined with Asgard's post-hiring knowledge that Moreno had been transferred to DLI's accounting department, raises a fact question as to the foreseeability of Moreno's embezzlement in the absence of disclosure by Asgard to DLI for purposes of a negligent retention claim. Accordingly, we conclude that the trial court erred in granting summary judgment in Asgard's favor as to DLI's negligent retention claim.

## IV. Affirmative Defenses

As set forth above, we must affirm the trial court's judgment if any of the independent summary-judgment grounds is meritorious, notwithstanding our conclusion as to DLI's negligent retention claim. *See $90,235*, 390 S.W.3d at 292. Accordingly, we shall address whether Asgard conclusively established every element of any of its affirmative defenses. *See Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996) (noting to prevail on a motion for summary judgment, a defendant must conclusively establish each element of any affirmative defense that was before the trial court). Asgard moved for summary judgment on the affirmative defenses of quasi-estoppel, waiver, limitations, and laches.

---

[14] Moreno was hired initially in 1997. Her alleged co-conspirators were hired initially between 1998 and 2002.

20

**Quasi-estoppel and Waiver**. Asgard argued in its traditional motion that DLI is estopped from complaining and waived its right to complain that Asgard was negligent in failing to perform background checks because DLI failed to independently verify whether Asgard had been performing background checks.[15] In support of this argument, Asgard presented Davis's deposition testimony in which he stated he "took [Asgard] at [its] word" and did not independently verify that it was performing background checks on employees.

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). The doctrine applies only when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced or from which he accepted a benefit. *Id*.

DLI's reliance on Asgard's purported reassurance that it was conducting background checks is not the assertion of a right inconsistent with a position DLI previously had taken. Davis's uncontradicted testimony was that he believed Asgard kept its "word." Asgard presented no evidence of any inconsistencies in DLI's position.

Even if DLI were somehow asserting a right inconsistent with a position previously taken, its reliance on Asgard's representations would not have been unconscionable. *See Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 638 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("[T]o constitute quasi-estoppel . . . conduct had to have been unconscionable."). Asgard presented no evidence that DLI had any reason to independently verify that Asgard was

---

[15] Asgard also asserted these affirmative defenses to DLI's negligent supervision claim. We need not address the negligent supervision claim because we hold that Asgard conclusively established it had no duty to manage and supervise Moreno after she was transferred to the accounting department.

21

conducting background checks or had any reason to suspect that Asgard was not doing so. DLI's actions under these circumstances were not unconscionable.

Waiver is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Tenneco*, 925 S.W.2d at 643. Silence or inaction, for so long a period as to show an intention to yield the known right, may also establish waiver. *Id*. The elements of waiver are (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008); *Clear Lake Ctr., L.P. v. Garden Ridge, L.P.*, 416 S.W.3d 527, 542 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Asgard argued that DLI took no action to ensure that Asgard performed background checks "[f]or more than [10] years." Asgard did not present evidence to support this statement. It only presented evidence that Davis believed Asgard was conducting background checks for an unspecified period of time. Moreover, actual knowledge is required to establish waiver. *Garden Ridge*, 416 S.W.3d at 542. Asgard did not present evidence that DLI knew facts pertinent to the purported negligence. *See id*. In fact, Davis testified he believed Asgard had been conducting background checks on its employees. Asgard presented no evidence that DLI knew Asgard was not conducting background checks. Similarly, Asgard presented no evidence DLI intended to relinquish its purported right to be provided with employees who had been subjected to background checks. Accordingly, Asgard did not present conclusive evidence that DLI intentionally relinquished a known right or engaged in conduct inconsistent with that right.

22

**Limitations and Laches**.[16] Asgard also argued in its traditional motion that DLI's negligent retention claim was barred by the two-year statute of limitations because DLI's officer and attorney James Cox learned about Moreno's criminal history in 2006 and the lawsuit was not filed until 2011.[17] *See* Tex. Civ. Prac. & Rem. Code § 16.003(a) (requiring certain tort claims to be brought within two years after cause of action accrues); *see also JPMorgan Chase Bank, N.A. v. Prof'l Pharmacy II*, No. 02-11-00373-CV, 2014 WL 7473779, at \*10 (Tex. App.—Fort Worth Dec. 31, 2014, no pet.) (applying two-year statute of limitations from section 16.003(a) to negligence claim).[18] As the only evidence in support of this argument, Asgard presented a letter purportedly written by Cox and sent to Arthur Grider, indicating that Cox learned in 2006 that Moreno had a misdemeanor theft charge in 1995 for which she received deferred adjudication. In response, DLI presented evidence that Cox did not write the letter.[19] This raises a fact question as to whether Cox actually learned of Moreno's criminal history in 2006.[20] Thus, Asgard did not conclusively establish that DLI's negligent retention claim was barred by limitations.

Asgard argued alternatively that it was entitled to summary judgment on its laches defense because DLI unreasonably delayed in bringing its negligent

---

[16] Asgard moved on these defenses as to all DLI's claims. Our discussion is directed only to the negligent retention claim, as we conclude Asgard conclusively established it was entitled to summary judgment on DLI's other claims.

[17] We note that Cox also represented Asgard.

[18] In cases governed by the discovery rule, a cause of action for negligence accrues when the plaintiff discovers, or should have discovered through reasonable diligence, the injury and that it was likely caused by the wrongful acts of another. *J.M.K. 6, Inc. v. Gregg & Gregg, P.C.*, 192 S.W.3d 189, 196 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

[19] Cox denied writing the letter in his deposition and in an affidavit presented in response to Asgard's traditional motion.

[20] We thus need not address whether Cox's knowledge could be imputed to DLI.

retention claim. To prevail on a laches defense, Asgard was required to prove DLI unreasonably delayed in asserting its rights and Asgard made a good-faith change in position to its detriment because of the delay. *See Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998); *see also Tex. Kidney, Inc. v. ASD Specialty Healthcare*, No. 14-13-01106-CV, 2014 WL 3002425, at *7 (Tex. App.—Houston [14th Dist.] July 1, 2014, no pet.) (mem. op.). Asgard again relied only on the Cox letter in support of this defense. Asgard did not present any evidence—or argument—that it made a good-faith change in position to its detriment because of any delay by DLI in bringing its negligent retention claim. Accordingly, Asgard did not conclusively establish that it was entitled to summary judgment on its laches defense.

We conclude that Asgard was not entitled to summary judgment on any of its affirmative defenses.

## V. Personal Liability Claims Against Arthur Grider

Asgard's traditional motion also challenged DLI's claims against Grider in his personal capacity. DLI argues for the first time on appeal that Grider is personally liable under an alter ego theory. Because DLI did not plead an alter ego theory in the trial court, we do not reach this issue. DLI does not otherwise challenge the trial court's order granting summary judgment as to its claims against Grider in his personal capacity.

We sustain DLI's first issue as to the trial court's grant of summary judgment in favor of Asgard on DLI's negligent retention claim. We overrule that issue as to all of DLI's other challenges to the trial court's grant of traditional summary judgment.

24

## VI. Respondeat Superior

In its second issue, DLI challenges the trial court's summary judgment in favor of Asgard on DLI's respondeat superior claim. As set forth above, Asgard filed a combined no-evidence and traditional summary judgment motion on DLI's respondeat superior claim, and the trial court granted that motion without specifying the grounds. Because we conclude we are required to affirm the summary judgment ruling on traditional grounds, we need not address the no-evidence grounds for summary judgment. *See Wilkinson*, 2014 WL 3002400, at *5.

Respondeat superior is the theory by which the employer is vicariously liable for the torts of an employee acting within the scope of employment. *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998). "[A]n employer is liable for its employee's tort only when the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired." *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). In certain instances, an employee of one employer may become a borrowed employee of another and cease being an employee of the general employer. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2002); *see also Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 583 (Tex. 1977). The essential inquiry under the borrowed servant doctrine is which employer had the right of control of the details and manner of the employee's work. *Alaniz v. Galena Park Indep. Sch. Dist.*, 833 S.W.2d 204, 206-07 (Tex. App.—Houston [14th Dist.] 1992, no writ) (analyzing borrowed servant doctrine in whistleblower case). The employer that has the right to direct and control the actions of the employee is vicariously liable for the employee's actions. *See St. Joseph Hosp.*, 94 S.W.3d at 543.

In its summary judgment motion, Asgard asserted that the borrowed-servant

25

doctrine barred DLI's respondeat superior claim because DLI had the exclusive right to control Moreno's work and Asgard did not control Moreno's work. DLI responded that the language of the contracts and facts relating to the right of control over Moreno precluded summary judgment in Asgard's favor.

Evidence in support of Asgard's motion for summary judgment consisted of the deposition testimony of Davis, Cole, and Bill Kelley, DLI's manager of operations. Asgard also offered the deposition testimony of Arthur and Tom Grider. Regarding Moreno's placement at DLI and Asgard's involvement, Davis testified:

- The receptionist position for which Moreno was placed had no written job description, and in that position, she was not expected to handle financial records, prepare or process checks, handle petty cash, or issue credit cards.

- Approximately two years after Moreno began working as a receptionist, Cole moved her to the accounting clerk position. Cole obtained Davis's approval to make this change.

- DLI promoted Moreno to the head of accounts payable and accounts receivable, and Moreno reported primarily to Cole.

- DLI did not have the ability to fire an Asgard employee, but it could notify Asgard that the employee was no longer needed.

- The Asgard on-site program manager—Tom Grider—did not have the ability to make job assignments within DLI facilities. Although Moreno was required to "report her performance" to the Asgard supervisor on premises, Davis did not know "exactly" how she did so.

- Davis instructed Moreno to transfer funds from the various DLI bank accounts, and he designated her as the "System Manager" of the Chase bank account. Moreno did not seek or obtain approval from Asgard to move funds from DLI's operating account to the savings account.

- Asgard was not responsible for approving DLI's vendor's invoices for

26

payment. Davis never asked Tom Grider to review Moreno's accounts payable or accounts receivables reports, nor did he see him do so.

- DLI issued credit cards to Moreno, and if anyone approved the charges, it would have been Cole.

Cole testified that Davis was Moreno's boss for accounting purposes and that she reported to Cole for personnel issues. He was unequivocal in his testimony that Moreno did not report to Asgard. Kelley also testified that Moreno reported to Cole when she became head of accounting, and after 2008, Moreno reported to Davis and Kelley. Moreno was trained for her accounting work by Northam, Davis, and Cole. Kelley did not rely on Asgard to supervise the day-to-day work of the accounting department. DLI maintained operational control over all of its departments.

Tom Grider testified that Moreno reported to Cole, and Moreno did not report to either Tom or Arthur Grider. DLI never complained about how and to whom Moreno reported. Further, Tom Grider did not direct Moreno in her job assignments, did not train Moreno for her duties in the DLI accounting department, and was not involved in the decision to move Moreno from her receptionist position to accounting. No one with Asgard had any involvement in Cole's decision to transfer Moreno to accounting.

Finally, Arthur Grider testified that Tom Grider did not provide technical supervision to personnel staffed at DLI. Arthur confirmed that either Cole or DLI's plant manager supervised Moreno when she worked as a receptionist and that personnel provided by Asgard in the accounting department at DLI did not report to Asgard.

In response, DLI contends that in the Agreement, Asgard agreed to supervise Moreno. As discussed above, however, Asgard had no involvement in Moreno's

27

promotion to head of accounting, Moreno answered only to DLI employees after her promotion, and Asgard had no authority to direct her job assignments. Asgard thus demonstrated that DLI had the exclusive right to control Moreno's work in the accounting department, and Asgard did not do so.

DLI argues that emails between Tom Grider and Moreno show that Tom supervised Moreno's work. Even construed in the light most favorable to DLI, the emails show only that Moreno was in the accounting department and that the two exchanged emails regarding Asgard's administrative matters.[21] They are not evidence that Asgard controlled Moreno's day-to-day responsibilities in that department.[22]

The uncontradicted evidence is that Asgard did not know of and was not consulted about DLI's decision to transfer Moreno to the accounting department and then promote her to head of that department; Moreno did not answer to Asgard after she was transferred; and Asgard did not direct or oversee her job assignments. We conclude that Asgard conclusively established it had no right to control Moreno's day-to-day duties in the accounting department. *See St. Joseph Hosp.*, 94

---

[21] The emails involved weekly payroll deductions that needed to be corrected on an Asgard invoice, healthcare provider forms to be completed by an Asgard employee, and another Asgard employee's paycheck.

[22] DLI cites *Lara v. Lile*, 828 S.W.2d 536, 538 (Tex. App.—Corpus Christi 1992, writ denied), for the proposition that in Texas, we presume an employer retains the right to control its own employees. That case quotes the following language from the Restatement of Agency:

> [I]n the absence of evidence to the contrary, there is an inference that the actor remains in [her] general employment so long as, by the service rendered another, [she] is performing the business entrusted to [her] by the general employer. *There is no inference that because the general employer has permitted a division of control, he has surrendered it.*

*Id.* (quoting Restatement (Second) of Agency § 227 cmt. b. (1958) (first emphasis added.)). The *Lara* court further analyzed the case "[b]eginning with the inference that the general employer retains control" to determine "what control [it] surrendered to the special employer." *Id.* Here, Asgard presented conclusive evidence that it did not control Moreno's work in the accounting department.

S.W.3d at 543.

We overrule DLI's second issue.

### *Conclusion*

We reverse the trial courts summary judgment as to DLI's negligent retention claim and remand that issue to the trial court for proceedings consistent with our opinion. We affirm the trial court's judgment in all other respects.

/s/    Martha Hill Jamison
         Justice

Panel consists of Justices Boyce, Jamison, and Donovan (Justice Donovan dissenting).