**Opinion issued December 22, 2016**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-15-01005-CV**

————————————

**HENRY RAWSON JR. AND SUSAN RAWSON, Appellants**

**V.**

**OXEA CORPORATION, DASHIELL CORPORATION, AND MUNDY MAINTENANCE AND SERVICES LLC, Appellees**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-07842**

---

**MEMORANDUM OPINION**

In this appeal, we determine whether the trial court correctly granted summary judgment to Oxea Corporation based on the protections afforded under Chapter 95 of the Civil Practice and Remedies Code, which shields property

owners from liability to contractors, subcontractors, and their employees in certain circumstances. The summary judgment disposed of the negligence claims brought by Henry Rawson Jr., a contractor's employee, who was injured while working on Oxea's property.[1] The summary judgment also disposed of a loss-of-consortium claim asserted by Rawson's wife, Susan. On appeal, the Rawsons identify seven issues, attacking different aspects of the trial court's summary-judgment. Because Oxea carried its summary-judgment burden of establishing that the protections of Chapter 95 apply to Henry Rawson's claims, and Rawson did not meet his summary-judgment burden of offering evidence sufficient to raise a genuine issue of material fact regarding the exception to Chapter 95's protections, we affirm the trial court's judgment.

**Background**

Oxea owns a chemical plant in Baytown, Texas. It also owns an electrical substation located across the road that supplies power to the plant. The chemical plant acquired the substation from the power company in 2003. The substation is a structure comprised of steel beams, attached to a concrete foundation, and contains electrical equipment. The substation has two transformers: Transformer One and Transformer Two. Each transformer supplies electricity to different parts of the

---

[1] Rawson also sued Dashiell Corporation and Mundy Maintenance and Services LLC. After this appeal was filed, the Rawsons settled their claims with Dashiell Corporation and Mundy Maintenance. This Court granted the Rawsons' motions to dismiss their appeal against Dashiell and Mundy Maintenance.

2

plant.  Power comes into the substation through transmission lines at 138,000 volts.  The transformers then reduce the power to 12,470 volts for distribution into the plant through other lines running from the substation.  Two power lines run to the plant from Transformer One and two lines run to the plant from Transformer Two.

On Saturday, June 9, 2012, a raccoon entered the substation and caused an electrical short, tripping breakers and shutting off power to the part of the plant powered by Transformer One.  The short circuit also damaged two insulators in the substation.  The insulators attach bare metal electrical conductors, individually known as a "bus" or a "bus bar," to the steel beam support structure that runs into the concrete foundation.  The insulators also prevent electricity from flowing from the electrically-charge busses into the steel support-beam structure and down into the ground.

Alvin Kocurek, an Oxea employee, was called to the plant to address the power outage.  At that time, Kocurek had worked at the plant for 37 years.  He was a journeyman electrician and "point person" for the substation.  It was determined that, if power was turned back on to the plant from Transformer One without replacing the insulators, power would flow into the substation's steel support structure and down to the ground, causing severe damage to the substation.

Because Oxea had a formal policy prohibiting its employees from working on electrical equipment with a voltage exceeding 600 volts, Oxea personnel could

not replace the insulators. The insulators needed to be replaced by an outside contractor with the necessary skills to work on high-voltage lines.

While waiting for the insulators to be replaced, power needed to be restored to the entire plant. The plant had been designed so that it could be powered by only one of the transformers. This could be accomplished by tying the electrical lines that ran from Transformer Two to the lines inside the plant that normally received power from Transformer One. Kocurek and a team, which included other Oxea employees, met to devise a procedure to tie the lines together and to switch the power from Transformer Two to energize the lines within the plant that were normally powered by Transformer One. However, in devising the procedure, Oxea also needed to "isolate" the work area, where the insulators would be replaced, from the energy source. In other words, the procedure for switching the power in the plant also needed to prevent the area where the work on the insulators would be performed from being energized with electricity.

Kocurek prepared a hand-written procedure for switching the power from Transformer Two to the lines inside the plant that were normally energized by Transformer One. He also intended for the procedure to isolate the work area from being energized on the Transformer One side where the insulators would be replaced. In preparing the switching procedure, Kocurek consulted the plant's

4

"one-line diagram," which shows all the electrical circuits coming to and going from different apparatuses in the plant.

Kocurek would later explain in his affidavit how the power switch was accomplished:

14. The plant was designed so that, if necessary, it could run off of a single transformer. The plant had several areas that needed to be energized from Transformer No. 2 once Transformer No. 1 shut down. In order to energize these areas, it was necessary to close various switches inside of the plant to tie these areas together. This is mainly conducted through switch gear located inside of block houses.

15. Inside of the Oxea plant, we had four blockhouses. We checked the breakers in all four block houses so we could assess the condition of the plant. We determined that we would need to conduct switching at two of these block houses, the Area 2 and the VA Cooling Tower block houses. This would allow us to tie together power lines to restore electricity to the portions of the plant which had lost power. The switch gear in the block houses are sometimes referred to a "line switch." The switch gear are housed inside of large cubicles inside of the block house that permit them to be safely operated from a handle outside of the enclosure without exposing the operator to direct contact with the switch gear mechanism or energized lines or equipment. This switch gear allowed us to switch the flow of power to different areas of the plant. . . .

. . . .

21. In the substation, we had opened up all the knife switches located in the substructure that normally received power from the No. 1 transformer. . . .

Even though power was restored to the plant, the insulators still needed to be replaced before Transformer One could be re-energized. Since acquiring the substation, Oxea had used a contractor, Dashiel Corporation, and its subsidiary,

Dacon Corporation, to work on the high-voltage equipment at the facility. Henry Rawson was employed by Dacon as a high-voltage lineman. When Dacon received the request from Oxea, Rawson agreed to go to the substation to replace the insulators.

After arriving at the substation, Kocurek reviewed with Rawson what Oxea had done to switch the power and isolate the work area. Before beginning his work, Rawson used a voltmeter, which measures electrical current in a line, to test the circuits where he would be working to ensure they were not energized. Rawson's testing showed that the area was not energized. Nonetheless, as he was in the process of replacing the insulators, Rawson was injured when he contacted a bus bar while it was carrying high-voltage electricity. Rawson claimed that the bus bar was not energized when he initially touched it but had become energized while his hand was on it.

After the accident, Oxea conducted an investigation. Kocurek discovered that the bus bar involved in Rawson's accident had become energized by a condition known as "backfeed," which occurs when power flows in the direction opposite its usual route. Here, under normal conditions, the power from the two transformers flowed from the substation into the plant. After Rawson's accident, Kocurek realized that, because the lines had been tied together to power the whole plant from Transformer Two, power from the plant had flowed in the wrong

6

direction back up lines on the Transformer One side and had energized the bus bar where Rawson was working. In other words, Kocurek realized that backfeeding had energized the bus bar.

Following the accident, Kocurek also realized that, had he closed "pole top switches," which were located inside the fence of the plant, approximately 1,000 feet away from the substation, the backfeeding of the power to the substation would not have occurred. The pole top switches are normally kept open, allowing power to flow through them. Had the pole top switches been closed, the backfeeding of power to Transformer One would have been prevented.

Rawson and his wife, Susan, filed suit against Oxea. Rawson sued for negligence and gross negligence, and Susan asserted a claim for loss of consortium. In their amended petition, the Rawsons assert that Kocurek "knew that the particular substation was configured such that, when isolating for work inside the substation, [it] created a dangerous condition called backfeeding. Kocurek [was] well aware of this condition, [was] aware that it was dangerous, and knew how to eliminate it[.] [Kocurek] just forgot to do so[.]" The Rawsons alleged, "[A]lthough he was fully aware of the backfeed condition, Kocurek . . . forgot to pull [the pole top] switches to eliminate it[.]" They further averred that "Kocurek advised Henry Rawson that [Kocurek] had personally pulled all of the necessary switches in order to completely isolate the work area[.]" The Rawsons

7

alleged that Henry had "asked [Kocurek] for the one-line diagram, which would show the lineup of every electrical line and every switch, so that Rawson could verify what Kocurek had done." They claimed that Kocurek had told Rawson there was no one-line diagram available and assured him that he "had nothing to worry about." The Rawsons also alleged that Kocurek had not followed Oxea's company policies when conducting the isolation and power-switching procedure, claiming that Kocurek was in a hurry to get the work done. For example, the Rawsons pointed out that Kocurek's hand-written procedure for switching the power and isolating Rawson's work area had not complied with company policy. They alleged, "although [Oxea's] policy requires a documented switching procedure verified and documented, Kocurek, according to him, did not have the time to complete one[.]"

The Rawsons claimed that Oxea owed Rawson a duty of care and had breached that duty. They alleged that Oxea's following acts and omissions had proximately caused the Rawson's injuries:

1) Contributing to an unsafe work site;
2) Creating an unsafe work condition;
3) Failing to identify and remediate an unsafe work condition;
4) Participating in and contributing to acts that caused the incident in question;
5) Failing to provide timely assistance, or to ensure other protections were in place;
6) Failing to ensure a proper and comprehensive job safety analysis was completed that identified and addressed all hazards;
7) Failing to warn of a known hazard and dangerous condition;

8

8) Failing to read, understand, and follow published safe work policies and procedures;

9) Promulgating and following unsafe work policies;

10) Creating latent dangers, but failing to warn of same;

11) Creating the unsafe design of a substation;

12) Failing to provide adequate and competent personnel and supervisory personnel as promised; and

13) Failing to ensure a safe work area, as promised

Oxea filed a hybrid motion for summary judgment, asserting that Chapter 95 of the Texas Civil Practice and Remedies Code protected it from liability on all of the Rawsons' claims. Oxea also asserted that, should it not be protected by Chapter 95, the Rawsons' claims fail as a matter of law. In response, the Rawsons claimed (1) Chapter 95 does not apply to their claims, (2) their evidence established Oxea's liability even if Chapter 95 applies, and (3) should Chapter 95 not apply, there are genuine issues of material fact regarding their negligence claims. Without specifying the reason, the trial court granted summary judgment in Oxea's favor.

The Rawsons now appeal, asserting that the trial court erred by granting summary judgment in Oxea's favor. The Rawsons present seven issues, challenging the various grounds on which Oxea pursued summary judgment and challenging two evidentiary rulings of the trial court.

**Summary-Judgment Evidence**

In their third and fourth issues, the Rawsons contend that the trial court erred when it sustained Oxea's objections to certain evidence offered in support of their

9

response. The evidence was offered to support the Rawsons' theory that the bus bar was not already energized when Rawson began his work on the substation. Rather, they claim that the bus bar became energized after Rawson made contact with it.

We review a trial court's decision to admit or exclude summary judgment evidence for an abuse of discretion. *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 747 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000)). The Rawsons first assert that the trial court abused its discretion in sustaining Oxea's objection that the following portion of Rawson's summary-judgment affidavit was conclusory: "Shortly after that, I heard a buzz that indicated to me that one of the lines had become energized which had not been energized before. I believe that someone operated a switch or flipped a breaker which caused the line to become energized."

The Rawsons also assert that the trial court erred by sustaining Oxea's objection that an excerpt from the deposition of Oxea's expert, J. Dagenhart, had assumed facts in evidence and called for speculation and conjecture. In the excerpt, the Rawsons' attorney had asked Dagenhart whether it was possible that the line on which Rawson was working had become energized when someone in the plant closed a breaker to re-energize the telephone system. Dagenhart said that he "could see . . . situations where that might be the case." Oxea asserted that this

10

was an improper hypothetical because it was not based on the facts of the case. Oxea also objected that the Rawsons had not included Dagenhart's errata sheet with the deposition excerpt. In his errata sheet, Dagenhart stated that he had reviewed additional materials and had learned that there was no need to switch power for the telephone system at the time Rawson was at the facility because the telephones were already on line at that point.

To obtain a reversal on the trial court's exclusion of evidence, an appellant must establish the error was harmful and was calculated to cause and probably did cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a). To meet that burden, an appellant must show the erroneously excluded evidence was controlling on a material issue dispositive of the case, the evidence was not cumulative, and its absence resulted in an improper judgment. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). Generally, errors relating to the admission or exclusion of evidence will not entitle an appellant to reversal unless the appellant can show the entire case turns on the complained of evidence. *In re Estate of Denman*, 362 S.W.3d 134, 141 (Tex. App.—San Antonio 2011, no pet.). Here, the Rawsons have not shown that they were unable to defend against Oxea's motion for summary judgment without the excluded evidence. Nor have the Rawsons shown that the evidence was not cumulative of other evidence. To the contrary, the Rawsons indicate that other evidence—such as Rawson's testimony

that his testing with the voltmeter showed that the work area was not energized—demonstrated that the area was not energized when he began his work and supports his theory that it became energized from backfeed while he was installing the insulators.

We overrule the Rawsons' third and fourth issues.

**Summary Judgment**

In their first and second issues, the Rawsons assert that Oxea did not prove its right to summary judgment because Chapter 95 does not apply to their claims, and, even if it does apply, their summary-judgment evidence raised fact issues regarding whether the exception to Chapter 95's protection applies.

**A.     Chapter 95**

Chapter 95 of the Texas Civil Practice & Remedies Code applies to a claim:

(1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and

(2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.002 (Vernon 2011).

When Chapter 95 applies, Section 95.003 confers liability protection to property owners as follows:

A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor

12

or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property . . . unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

*Id.* § 95.003 (Vernon 2011).

When Chapter 95 does not apply, and an independent contractor's employee sues a property owner for negligence, the common law requires the plaintiff to show that the owner exercised some control over the relevant work and either knew or reasonably should have known of the risk or danger. *Ineos USA, LLC v. Elmgren*, No. 14–0507, 2016 WL 3382144, at *2 (Tex. June 17, 2016) (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985); *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 101 (Tex. 2000)). But, when it does apply, Chapter 95 "grants the property owner additional protection by requiring the plaintiff to prove that the owner 'had actual knowledge of the danger or condition,' so the owner is not liable based merely on what it reasonably should have known." *Id.* (quoting TEX. CIV. PRAC. & REM. CODE § 95.003(2)). And, if it applies, Chapter 95 is the plaintiff's sole means of recovery for all negligence claims that arise from either a

13

premises defect or the negligent activity of a property owner. *Id.* at \*2–\*3 (citing *Abutahoun v. Dow Chemical Co.*, 463 S.W.3d 42, 50–51 (Tex. 2015)).

A property owner, such as Oxea, has the burden of establishing Chapter 95's application to a plaintiff's claims. *See Cox v. Air Liquide America, LP*, No. 14–15–00600–CV, 2016 WL 3703199, at \*2 (Tex. App.—Houston [14th Dist.] July 12, 2016, no pet.) (citing *Rueda v. Paschal*, 178 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.)). Once the property owner has met its burden of establishing Chapter 95's application, the burden then shifts to the plaintiff to establish the requirements of Section 92.003—control, actual knowledge, and inadequate warning—in order to trigger the exception to Chapter 95's liability protections. *Ineos*, 2016 WL 3382144, at \*8 (citing *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 352 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that, once defendant proves the applicability of Chapter 95, burden shifts to plaintiff to fulfill requirements of section 95.003)).

Among its arguments for traditional summary judgment, Oxea contended that Chapter 95 applied to the Rawsons' claims. Because it had the burden of proof on the issue, Oxea needed to establish its right to summary judgment by conclusively proving application of all the elements of Chapter 95 to Rawson's claims. *Rhone Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston

14

[1st Dist.] 2006, pet. denied). Oxea also asserted that its summary-judgment evidence conclusively negated the essential Section 95.003 requirements of control, actual knowledge, and inadequate warning that Rawson needed to trigger the exception to Chapter 95's liability protection.

**B.  Traditional Summary Judgment Standard of Review**

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When, as here, the trial court does not specify the grounds for its grant of summary judgment, we must affirm the summary judgment if any of the theories presented to the court and preserved for appeal are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641 (Tex. 2015). When a plaintiff moves for summary judgment on its claim, it must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone Poulenc*, 997 S.W.2d at 223; *Anglo–Dutch Petroleum Int'l*, 193 S.W.3d at 95. A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 815 (Tex. 2005).

Conversely, a defendant is entitled to summary judgment if it disproves at least one element of the plaintiff's cause of action as a matter of law. *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 476–77 (Tex. 1995).

If a summary-judgment movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty*, *Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). To determine if a fact issue exists, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). We review summary-judgment evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *SeaBright Ins. Co.*, 465 S.W.3d at 641.

## C. Chapter 95's Application to the Rawsons' Claims

### 1. Condition or use

Section 95.002(2) provides that Chapter 95 applies to a claim "that arises from the condition or use of an improvement to real property where the contractor . . . constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2). The Rawsons first contend that Oxea

16

did not prove the "condition" or "use" requirement. The Rawsons acknowledge that the Supreme Court of Texas has interpreted the condition or use requirement to mean that Chapter 95 applies to all negligence claims that arise from either a premises defect (a "condition") or a property owner's negligent activity (a "use"). *See Abutahoun*, 463 S.W.3d at 50–51.

Relying on *Abutahoun*'s holding, Oxea pointed out that, regardless of whether they are based on premises liability or negligent activity, the Rawsons' claims arise from a condition or use for purposes of Chapter 95. In *Abutahoun*, the supreme court reiterated that "'negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe.'" *Id.* at 50 (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010)). In its motion for summary judgment, Oxea asserted that, if the Rawsons' claims can be interpreted as arising from a bus bar that was already energized when he touched it, that is, from a nonfeasance theory that Oxea failed to make his work area safe, then the Rawsons' claims arise from a premises defect. *See Oncor Elec. Delivery Co., LLC v. Murillo*, 449 S.W.3d 583, 593–94 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (discussing distinction between premises liability and general negligence). Oxea further points out that, to the extent the Rawsons allege that

17

Rawson's injury arose from the bus bar becoming energized while he was touching it—that is, from contemporaneous conduct by Oxea—such claims could be interpreted as arising from a negligent activity. *See id.* Either way, the claims arise from a condition or use of the improvement. *See Abutahoun*, 463 S.W.3d at 50.

On appeal, the Rawsons assert that Oxea's "failure to provide [Rawson] with information by which he could have discovered the backfeed condition and [Oxea's] misrepresentation that no backfeed existed . . . were neither the 'contemporaneous activities' required for a negligent activity claim nor an 'intentional or inadvertent state of being,' the definition of a 'condition.'" In *Abutahoun*, the supreme court stated: "We can only conclude that the Legislature intended for Chapter 95 to apply to *all negligence claims* that arise from either a premises defect or the negligent activity of a property owner or its employees by virtue of the 'condition or use' language in section 95.002(2)." *Id.* (emphasis added). We interpret this language as being broad enough to encompass all of the Rawsons' negligence claims, including their claim that Oxea failed to provide Rawson with sufficient information to discover the premises defect and their claim that Oxea misrepresented the condition of the property. *See id.*; *see also Oiltanking Houston, L.P. v. Delgado*, No. 14–14–00158–CV, 2016 WL 4145997, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 4, 2016, pet. filed) (holding that

18

*Abutahoun*'s language "sweeps broadly enough to encompass all flavors of negligence," including a claim for negligent undertaking).[2]

We hold Oxea conclusively established that the Rawsons' claims arose from a condition or use for purposes of Chapter 95.

### 2. *Same improvement*

The Supreme Court of Texas recently held that "Chapter 95 only applies when the injury results from a condition or use of the same improvement on which the contractor (or its employee) is working when the injury occurs." *Ineos*, 2016 WL 3382144, at *7. The Rawsons contend that Chapter 95 does not apply to their claims because Oxea failed to prove that Rawson's injuries arose from a condition or use of the "same improvement" on which he was working when he was injured. The Rawsons point out that Rawson was replacing an insulator when he was injured and that he was not injured by an insulator. In its motion for summary judgment, Oxea asserted that the "improvement" to real property on which Rawson was working was not the insulators he was replacing, rather it was the electrical system of the substation.

---

[2] We also note that, in their response to Oxea's motion for summary judgment, the Rawsons represented that their negligence claims "encompass a negligent activity, negligent undertaking and premises liability theory." Chapter 95 has been held to apply to such claims. *See Abutahoun v. Dow Chemical Co.*, 463 S.W.3d 42, 50 (Tex. 2015); *Oiltanking Houston, L.P. v. Delgado*, No. 14-14-00158-CV, 2016 WL 4145997, at *5 (Tex. App.—Houston [14th Dist.] Aug. 4, 2016, pet. filed).

Oxea's position is supported by *Ineos*. There, the supreme court adopted a "broad" definition of the term "improvement," which for purposes of Chapter 95, includes "all additions to the freehold except for trade fixtures that can be removed without injury to the property." *Id.* at \*8 (citing *Abutahoun*, 463 S.W.3d at 49).

In *Ineos*, the plaintiff, Elgrem, was replacing a valve on a furnace when a valve near another furnace, several hundred feet away, exploded, injuring him. *See id.* at \*1, 8. Elgrem argued that "each furnace in the plant was a separate 'improvement' even though all of the furnaces were connected." *Id.* at \*8. The supreme court disagreed with Elgrem, reasoning that the evidence showed that "[t]he valves and furnaces, though perhaps 'separate' in a most technical sense, were all part of a single processing system within a single plant on Ineos' property." *Id.* The court held that "the evidence conclusively establishe[d] that the entire system was a single 'improvement' under Chapter 95." *Id.*

Applying the analysis in *Ineos*, the summary-judgment record shows that the improvement on which Rawson was working was the electrical substation. In his affidavit, offered in support of Oxea's motion for summary judgment, Kocurek testified as follows with regard to the substation:

> 3. . . . The electrical transformers and the supporting steel beams for the substructure at the substation are attached to the ground through concrete foundations.
>
> . . . .

20

7. The electrical lines are attached to the steel I-beams that make up the distribution side structure of the substation. Insulators are used to hold the bare metal electrical lines in place and to insulate them from the steel I-beams. The bare metal electrical lines ore also sometimes referred to as a "bus bar" or as a "bus."

. . . .

13. Transformer No. 1 supplied power to the plant through overhead electrical lines. These overhead electrical lines were attached to electrical busses located in the superstructure of the distribution side of the substation. There were two sets of lines that ran out from the distribution side of the substation over into the main Oxea plant. . . . .

Applying the broad definition of "improvement" adopted by *Ineos*, the summary-judgment record conclusively shows that the electrical substation was a single improvement under Chapter 95. *See id.* The electrical lines, the bus bars, and the insulators were all vital, integrated components of that single improvement and were not separate, discrete improvements.[3]

### 3. Repairing the improvement

The Rawsons further assert that Oxea failed to show that Rawson was constructing, repairing, renovating, or modifying an improvement, as required for Chapter 95 to apply to their claims. Instead, the Rawsons contend that Rawson

---

[3] On appeal, the Rawsons also assert, "Rawson's injuries also arose from the dangerous backfeed condition created by Oxea. Backfeed likewise is not a condition or use of an 'improvement to real property.'" They aver, "Electricity is a subtle, invisible, and mysterious force," not an improvement to real property. As discussed *infra*, Oxea conclusively showed that the substation, housing the electrical system, was a single improvement to real property. The electricity flowing through the improvement did not exist in an independent state at the time of Rawson's injury and was not a separate "improvement." *See Ineos USA, LLC v. Elmgren*, No. 14–0507, 2016 WL 3382144, at *8 (Tex. June 17, 2016).

was at the substation "to replace insulators." However, as discussed, the "improvement" on which Rawson was working was the electrical substation; the insulators were only a component of that improvement.

In his summary-judgment affidavit, Kocurek explained that "[i]nsulators are used to hold the bare metal electrical lines [the busses] in place and to insulate them from the steel I-beams" of the substation that run to the ground. With regard to what caused the damage to the substation, Kocurek testified:

> 8. [A] raccoon entered the steel substructure on the distribution side of the substation and caused a ground fault (meaning that the raccoon contacted an energized electrical bus while on [a] live metal beam, thereby causing, a short circuit when the electricity flowed through its body to the steel beam). This ground fault damaged two insulators and cut off power to a portion of the plant.

> 9. Once the insulators are damaged, the substation must be repaired by replacing the insulators so that when turned back on the power will not ground out to the steel beams. If the insulators were not replaced, it could result in a severe electrical fault and cause severe damage to the substation. We, therefore, could not operate our No. 1 transformer without these repairs being conducted.

Chapter 95 does not define the term "repairs." However, one court, adopting a dictionary definition, has defined repair, for Chapter 95 purposes, to mean "to restore to a good or sound condition after decay or damage; mend; . . . to restore or renew by any process of making good, strengthening, etc. . . ." *Montoya v. Nichirin-Flex U.S.A., Inc.*, 417 S.W.3d 507, 512 (Tex. App.—El Paso 2013, no pet.) (citing *Webster's New Universal Unabridged Dictionary* 1632 (2003)).

22

Kocurek's affidavit testimony shows that the substation could not be fully operational without replacing the damaged insulators. It is not in dispute that Rawson was replacing the damaged insulators when he was injured. And, as discussed, the insulators were a component of the substation, which was the "improvement" for purposes of Chapter 95. Thus, when the insulators were damaged, the substation itself was damaged, and replacing the insulators served "to restore [the substation] to a good or sound condition after [it was] damage[d]." *See id.* In other words, when he replaced the insulators, Rawson was repairing the improvement for purposes of Chapter 95.

We hold that Oxea conclusively proved that Chapter 95 applies to the Rawsons' claims.[4] Next, we examine the summary-judgment record to determine if Oxea disproved as a matter of law the application of Section 95.003's exception to Chapter 95's liability protections or whether a genuine issue of material fact exists regarding the liability exception's application.

---

[4]    On appeal, the Rawsons also assert that the legislative history of Chapter 95 does not support its applicability to the Rawsons' claims. However, the Rawsons do not direct us to where they raised this argument in the trial court, and it cannot be raised for the first time on appeal to defeat summary judgment. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("[I]ssues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence.").

**D.     Actual Knowledge**

On appeal, the Rawsons contend that they raised a fact issue as to whether Oxea had "actual knowledge" of the danger or condition that resulted in the injury. TEX. CIV. PRAC. & REM. CODE § 95.003(2) (providing that property owner is not liable "unless . . . the property owner had actual knowledge of the danger or condition resulting in the personal injury . . . and failed to adequately warn"). "Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident[.]" *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008). Actual knowledge of a dangerous condition is what a person actually knows, as distinguished from constructive or imputed knowledge, or what a reasonably prudent person should have known or should have foreseen. *Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also Kelly v. LIN Television of Tex., L.P.*, 27 S.W.3d 564, 572 (Tex. App.—Eastland 2000, pet. denied) (holding that evidence of negligent failure to inspect for stress fractures and metal fatigue does not show actual knowledge of danger of tower collapse due to stress fractures). As we have recognized, "[S]ection 95.003(2) elevated the alternative, common law, 'should have known' test of the premises owner's knowledge of a dangerous condition to an 'actual knowledge' requirement." *Phillips v. Dow Chem. Co.*, 186 S.W.3d 121, 133 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Circumstantial evidence establishes

actual knowledge only when it 'either directly or by reasonable inference' supports that conclusion." *Stewart*, 249 S.W.3d at 415 (quoting *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002)).

In its summary-judgment motion, Oxea asserted that, at the time of the injury, it lacked actual knowledge of the danger or condition of backfeeding of power from the plant up the line to the substation where Rawson was working. Among its summary-judgment evidence, Oxea offered Kocurek's affidavit. In addition to describing the procedure that was followed to switch the power and isolate Rawson's work area, Kocurek also provided the following relevant testimony in his affidavit:

16. I had never been involved in a situation before where we had to isolate the No. 1 transformer for electrical repairs inside of the substation.

. . . .

18. Inside of the plant, we had some pole top switches that were normally in a closed position, which would allow power to flow through them into the plant from the substation. These pole top switches were located some distance from the remote electrical substation that provided power to the plant. The two pole top switches on the poles for lines 8660 and 940 could be opened if we ever needed to perform preventive maintenance in certain areas inside of the plant. During the 37 year period that I worked at the plant before Mr. Rawson's accident, I've only had to open the switches on a couple of occasions. Those occasions involved preventive maintenance work inside of the plant so it was desirable to cut off all power coming from Transformer No. 1 into certain areas of the Oxea/Celanese plant.

. . . .

28. Since 2003 when we became owners of the distribution side of the substation, we have never had to run the entire plant off of Transformer No. 2 alone. Therefore, I did not realize power was going to be able to come back out and run into the part of the substation where Transformer No. 1 was located.

29. It wasn't until sometime after the accident had occurred that I realized that backfeed had allowed some of the bus in the Transformer No. 1 side of the substation structure to remain energized once we had finished our switching procedures earlier that morning some hours before Mr. Rawson arrived to perform the repair work at the substation.

30. At the time Mr. Rawson began his repair job in the substation, I did not know that there were any energized lines in the area where he would be performing his work.

Oxea also offered Kocurek's deposition testimony in support of its summary-judgment motion. At the beginning of the deposition, on page 7, Rawsons' attorney asked Kocurek: "You knew that there was a potential of backfeed didn't you?" Kocurek replied, "No. sir, I did not." A few questions later the attorney asked: "You knew that the backfeed condition existed at that plant, didn't you?" Kocurek responded, "No. sir." Shortly after this, on page 10, Kocurek was then asked: "[Y]ou knew the backfeed condition existed, didn't you?" Kocurek answered, "[N]ot that day, no sir."

In addition, Oxea pointed to Rawson's deposition testimony in which he stated that he had tested the area where he would be working and had determined that the area was not energized. Kocurek testified that he had believed on that day

26

the area was not energized. When asked, "So, as far as you knew and as far as he knew, he was working in an unenergized area?" Kocurek said, "That's correct."

Kocurek also testified that it was after Rawson was injured that he realized that the work area had become energized by a backfeeding of power from the plant to the substation. This was also when Kocurek realized that the pole top switches should have been opened to prevent the backfeeding of power. In his affidavit, Kocurek testified,

> 23. After the accident and after observing the bus that Mr. Rawson had touched, we were able to trace the overhead line back into the plant. We determined that, evidently, power had come back out of the plant going in the wrong direction (not the normal direction) and was coming back into the substation being fed by the power from Transformer No. 2.
>
> . . . .
>
> 25. Since the pole top switches for Lines 8660 and 940 are always in the closed and locked position, we then realized after the accident that is . . . how power was able to flow back out of the plant and into the power lines that terminated at the Transformer No. 1 side of the substation. This was a condition that normally would not exist at the plant/substation.

In their response to Oxea's motion for summary judgment, the Rawsons asserted, "The evidence shows that Kocurek, and other Oxea representatives, knew about backfeed, knew of its danger, [and] knew how to prevent it." On appeal, the Rawsons point to portions of Kocurek's deposition in which he testified that he had been aware of the potential for the "backfeed condition" to occur at the plant, that

27

he had used the pole top switches to prevent backfeed in the past, and that he had forgotten to open the pole top switches on the day of the accident. Among the evidence cited by the Rawsons is the following exchange between their attorney and Kocurek found on page 43 of Kocurek's deposition:

> Q. You've already told us you were aware there was this . . . backfeed condition, right?
>
> A. Yes.

The Rawsons also cite the following exchange from page 94 of Kocurek's deposition:

> Q. You would say to me "[] I had knowledge of the backfeed condition. I had knowledge that those switches should be opened; I just forgot about it, man, because we rarely do that," correct?
>
> A. That's correct.

Reviewing it in the light most favorable to them—and in isolation—the evidence cited by the Rawsons arguably raises a fact question regarding whether Oxea had actual knowledge, at the time of Rawson's injury, that a backfeed of power could potentially occur. However, when reviewing a summary judgment, "[we] must consider whether reasonable and fair-minded jurors could differ in their conclusions *in light of all the evidence presented.*" *Mayes*, 236 S.W.3d at 755 (emphasis added). We are to review the entire record and, at times, consider contrary evidence. *Am. Dream Team, Inc. v. Citizens State Bank*, 481 S.W.3d 725,

28

738 (Tex. App.—Tyler 2015, pet. denied) (citing *City of Keller*, 168 S.W.3d at 811–12).

Kocurek testified that he was aware of the backfeed condition only after he had indicated three times, at the beginning of his deposition, that he was not aware of a potential for backfeeding. When Kocurek stated for the third time, on page 10 of deposition, that he was not aware of a potential for backfeed on the day of the accident, the Rawsons' attorney said, "*I'm not asking about that day. Whether you forgot about it or whatnot, you knew there was a potential of backfeed because you've used those switches before, haven't you?*" (Emphasis added.) Kocurek responded, "That's correct." In other words, the Rawsons' attorney asked Kocurek to confirm that he had knowledge in the past about potential backfeeding under the circumstances in which he had used the pole top switches to prevent backfeeding. Thereafter, Kocurek's answers to the questions regarding his knowledge about backfeeding were being asked and answered within this framework.

To provide an understanding of the context in which he had used the pole top switches, Kocurek explained as follows in his affidavit:

> During the 37 year period that I worked at the plant before Mr. Rawson's accident, I've only had to open the switches on a couple of occasions. Those occasions involved preventive maintenance work inside of the plant so it was desirable to cut off all power coming from Transformer No. 1 into certain areas of the Oxea/Celanese plant.

29

Thus, when Kocurek testified that he had used the pole top switches to prevent potential backfeeding, it was within the context of conducting preventive maintenance inside the plant. It was not within the context of isolating a portion of the substation for repairs to be done on the power system nor was it in the context of switching power to run the whole plant from Transformer Two. This was confirmed by Kocurek in his affidavit:

> 16. I had never been involved in a situation before where we had to isolate the No. 1 transformer for electrical repairs inside of the substation.
>
> . . . .
>
> 28. Since 2003 when we became owners of the distribution side of the substation, we have never had to run the entire plant off of Transformer No. 2 alone. Therefore, I did not realize power was going to be able to come back out and run into the part of the substation where Transformer No. 1 was located.

Whether Kocurek, based on his limited past experiences of using the pole top switches as part of a different procedure, should have extrapolated that backfeeding might occur in the context of the power switching procedure involved here is not at issue. What is at issue is whether Kocurek had actual knowledge of the danger of backfeeding at the time of the accident. While it might support a reasonable inference that Kocurek *should have known* about the potential for backfeeding, the summary-judgment evidence, when considered altogether, does not support a reasonable inference that Oxea had actual knowledge of the danger of

backfeeding when the accident occurred, even when viewed in the light most favorable to the Rawsons.

Lastly, the Rawsons point out that, even though Kocurek denies mentioning backfeeding on the day of the accident, Rawson testified that Kocurek assured him there was no danger of backfeeding. The Rawsons assert that this supports an actual-knowledge inference because it shows that backfeeding was a "concern" that day. In contrast, Oxea contends that this evidence further supports its position that Kocurek did not have actual knowledge of the potential for backfeeding at the time of the accident. We find that Rawson's claim regarding Kocurek's assurance could give rise to either inference, neither more probable than the other. *See Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) ("The equal inference rule provides that a jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.").

We conclude that Oxea met its summary-judgment burden to conclusively show that Chapter 95 applies to the Rawsons' claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.002. Oxea also disproved the actual-knowledge element of the exception to Chapter 95's liability protection as a matter of law. *See id.* § 95.003. We further conclude that the Rawsons failed to offer sufficient evidence to raise a

31

genuine issue of material fact on these issues. We hold that the trial court properly granted summary judgment on Henry's Rawson's claims.

We overrule the Rawsons' first and second issues.[5]

## Loss-of-Consortium Claim

In their seventh issue, the Rawsons assert that the trial court erred when it granted summary judgment on Susan Rawson's loss-of-consortium claim. We have determined that the trial court correctly granted summary judgment on Henry Rawson's claims under Chapter 95. Because her claim is derivative of her husband's claim, the trial court also correctly granted summary judgment on Susan's loss-of-consortium claim. *See Reed Tool Co. v. Copelin*, 610 S.W.2d 736, 738–39 (Tex. 1980) (holding tortfeasor's liability for husband's physical injuries must be established as prerequisite to recovery of derivative claims such as wife's loss-of-consortium claim).

We overrule the Rawsons' seventh issue.

---

[5] Because of our disposition of these issues, we need not reach the Rawsons' remaining two issues, challenging the summary judgment.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.