**Reversed and Remanded and Majority and Concurring and Dissenting Opinions filed March 21, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00473-CV

---

**PRIORITY ARTIFICIAL LIFT SERVICES, LLC AND EP ENERGY E&P COMPANY, L.P., Appellants**

**V.**

**MICHAEL CHILES, Appellee**

---

**On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 2016-13626**

---

## M A J O R I T Y   O P I N I O N

Appellee Michael Chiles was working at an oil and gas processing facility in West Texas when pressurized fluid unexpectedly shot out of the end of a hose he was carrying. Chiles was thrown to the ground and taken to the hospital shortly thereafter, where he was diagnosed with a torn rotator cuff that required two separate surgeries to repair.

Chiles sued appellant Priority Artificial Lift Services, LLC ("Priority") and appellant EP Energy E&P Company, L.P. ("EP Energy") for damages caused by the incident. The parties proceeded to trial and the jury returned a verdict finding Priority and EP Energy liable for Chiles' injuries and assessing approximately $4 million in damages. The trial court signed a final judgment incorporating the jury's findings.

Priority and EP Energy appealed the trial court's final judgment and Chiles filed a cross-appeal. Because we sustain Priority's issue challenging the trial court's refusal to submit its borrowed employee jury question, we reverse the trial court's final judgment and remand the case for further proceedings.

## BACKGROUND

## I.   An Overview of the Parties' Relationships

EP Energy is a Houston-based oil and gas company. At the time of the incident, EP Energy held an oil and gas lease and a commercial surface lease to operate an oil and gas processing facility near Big Lake, Texas. EP Energy operated vertical heater treater tanks at this location, which were used to separate produced fluid into oil, gas, and water.

In 2011, EP Energy entered into a Master Service Agreement with Priority, pursuant to which Priority agreed to provide EP Energy with lease operators and other employees. The agreement states that Priority would operate as an independent contractor and its employees were "subject to [Priority's] sole and exclusive supervision, direction and control, and shall not be deemed, in fact or in law, to be employees of" EP Energy. Pursuant to this Agreement, Priority supplied EP Energy with two lease operators involved in the underlying incident: Clay Mateo and Abel Martinez.

2

EP Energy entered into a separate Master Service Agreement with Hawk Trucking. Hawk Trucking also operated as an independent contractor for EP Energy and provided the company with vacuum trucks and water hauling services. Chiles was working for Hawk Trucking at the time of the incident.

## II. The Incident

On May 3, 2014, Greg Simms was working as EP Energy's worksite supervisor at the Big Lake oil and gas processing facility. The location's heater treater tanks were scheduled to be cleaned that day and Simms called Hawk Trucking to request that Chiles be sent to perform the job. The heater treater cleaning process was comprised of three steps: (1) vacuuming the old water from the tanks and "bleeding out" the remaining pressure; (2) pumping the tanks full of clean water mixed with biocide; and (3) allowing the biocide mixture to sit in the tanks for approximately five hours before it was vacuumed out. According to Simms, the biocide would kill bacteria that could develop in the water and eventually "eat[] holes" in the heater treater tanks.

When Chiles arrived at the location, he attended a Job Safety Analysis ("JSA") meeting led by Simms. According to trial testimony from EP Energy safety specialist Todd Smith, the purpose of a JSA meeting is to break down the tasks being performed at the job site that day and identify particular hazards. Therefore, a JSA meeting generally is conducted "prior to engaging in an activity on the job site" so that everyone on location is aware of "potential hazards." Simms testified that Mateo and Martinez were not at the job site when he led that day's JSA meeting.

After the conclusion of the JSA meeting, Chiles started the heater treater cleaning process. While Chiles was working, Simms was sitting in his truck, talking on the phone, and dealing with a power outage at another facility. Around

3

this time, Mateo and Martinez showed up at the job site. According to Martinez, he and Mateo tried to check in with Simms but, because Simms was on the phone, they just jumped into work and started helping. Chiles recalled seeing Mateo and Martinez in the area where he was working.

According to Chiles, he was in the process of hooking hoses up from the heater treater tanks to his truck when he was "blasted in the face with fluid" and thrown to the ground. Unbeknownst to Chiles, Mateo had opened the valve on the heater treater tank and caused pressurized fluid to shoot from the end of the hose that Chiles was carrying. Describing the incident, Martinez said Mateo "opened the — the valve and chaos ensued." Chiles was transported to a nearby hospital and, after further medical consultations, was diagnosed with a torn rotator cuff on his left shoulder.

Safety specialist Smith investigated the incident involving Chiles. Discussing the incident's "root cause," Smith said Mateo "opened the heater treater valve without verbal or hand signal acknowledgement." Smith agreed that, if Mateo had "followed the JSA, he would have allowed Mr. Chiles to actually double check all the connections before the valves were open." Smith acknowledged that Mateo "was not given proper JSA orientation on this particular job" and agreed that Simms' failure to review the JSA with Mateo was "not meeting the expectation[s]" of EP Energy.

According to Smith, Mateo also was not properly identified as a short-service employee ("SSE"). Under EP Energy policy, an SSE is one that (1) has less than six months experience in the current job, or (2) has less than six months continuous employment with the current employer. Smith stated that an SSE is assigned a mentor to "instruct that short service worker on the EP way." An EP Energy worksite also is required to implement "a method for visually identifying

4

short service workers, *e.g.*, [a] different colored hard hat, hardhat stripe, or arm band."

In sum, Smith opined that "[c]ontrol of the site was lost and the expectations by the site leadership weren't met." Acknowledging that "Simms was supposed to be Clay Mateo's mentor," Smith explained that Simms "lost control of this operation."

## III. The Lawsuit and Subsequent Trial

Chiles filed suit in March 2016, seeking damages stemming from the 2014 incident. The parties proceeded to trial in April 2022. The jury heard testimony from 14 witnesses and reviewed numerous exhibits. After the close of evidence, a single liability question was submitted to the jury, to which the jury answered as follows:

### Question No. 1

Did the negligence, if any, of those named below proximately cause the occurrence in question?

| | |
|---|---|
| E.P. Energy E&P Company, L.P.: | Yes |
| Priority Artificial Lift Services, L.P.: | Yes |
| Hawk Trucking: | No |
| Michael Chiles: | No |

The following proportionate responsibility inquiry was submitted as Question No. 2:

### Question No. 2

For each person or company, you found caused or contributed to the occurrence, find the percentage of responsibility attributable to each:

5

| E.P. Energy E&P Company, L.P.: | 80% |
|---|---|
| Priority Artificial Lift Services, L.P.: | 20% |
| Hawk Trucking: | 0 |
| Michael Chiles: | 0 |

In total, the jury assessed $3,865,000 in compensatory damages. The trial court signed a final judgment on June 1, 2022, incorporating the jury's liability and damage findings.

Priority and EP Energy filed motions for new trial. EP Energy also filed a motion for judgment notwithstanding the verdict. All three motions were denied. Priority, EP Energy, and Chiles filed notices of appeal.

### ROADMAP

Priority raises two issues in its appellate brief: (1) the trial court erred by denying its request to submit a borrowed employee jury question, and (2) the evidence is insufficient to support the jury's damage assessments for Chiles' future medical expenses, mental anguish, and physical impairment.

EP Energy, in turn, raises five issues on appeal:

1. the trial court erred by granting Chiles' pretrial motion on EP Energy's Chapter 95 defense;

2. Chiles failed to secure a finding on premises liability, his only viable theory of recovery;

3. EP Energy owes no duty to independent contractors and Chiles failed to secure the necessary predicate findings regarding control;

4. the evidence is legally insufficient to support the jury's liability finding; and

5. the damages are excessive and lack evidentiary support.

Finally, Chiles raises a single issue on appeal and asserts the trial court erred by

refusing to hold EP Energy jointly and severally liable for the damages assessed in its final judgment.

As explained in our analyses below, we conclude the trial court abused its discretion by denying Priority's borrowed employee jury question and that this constitutes reversible error requiring a new trial. Because of our disposition of this issue, we need not address (1) Priority's second issue challenging the damages awarded, (2) EP Energy's second, third, fourth, and fifth issues, which challenge the applicable theories of liability, the evidence supporting those theories, and the damages awarded, or (3) Chiles' issue regarding joint and several liability.

However, we do address EP Energy's first issue, which challenges the trial court's pretrial rulings on EP Energy's and Chiles' summary judgment motions, both of which address the applicability of Chapter 95. Because we conclude the trial court did not err in denying EP Energy's summary judgment motion and granting Chiles' motion, we overrule EP Energy's first issue.

## ANALYSIS

## I.    Borrowed Employee Doctrine

In its first issue, Priority asserts the trial court erred by denying its request for a jury question inquiring whether Mateo was acting as a borrowed employee of EP Energy at the time of the incident.[1]  We agree.

---

[1] Priority adequately preserved this issue for appellate review. At the informal charge conference, Priority's counsel requested a borrowed employee question as to Mateo and Martinez. Summarizing their exchange, the trial court asked Priority's counsel, "Is your argument then that your — that the Priority employees are borrowed servants of E.P. Energy, and you would like a fact-finding from the jury on that?" Priority's counsel responded, "Correct." After hearing additional arguments from the parties, the trial court denied Priority's request for a borrowed employee question.

The following day at the formal charge conference, Priority submitted two proposed jury questions inquiring whether Mateo and Martinez were acting as borrowed employees of EP

## A.    Standard of Review and Governing Law

The trial court has broad discretion in submitting jury questions and we review alleged charge error only for an abuse of that discretion. *Mem'l Hermann Health Sys. v. Gomez*, 649 S.W.3d 415, 426 n.32 (Tex. 2022). "A trial court is required to submit controlling factual issues which are essential to a right of action or defense." *Indian Oil Co. v. Bishop Petroleum Inc.*, 406 S.W.3d 644, 658 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Moreover, those requested questions must be supported by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *Mohammadi v. Albertsons, LLC*, 656 S.W.3d 851, 858 (Tex. App.—Houston [14th Dist.] 2022, pet. filed). "A judgment will not be reversed based on charge error unless such error probably caused the rendition of an improper verdict or probably prevented a party from properly presenting the case to the appellate courts." *Mohammadi*, 656 S.W.3d at 858.

The borrowed employee doctrine is a tort doctrine addressing vicarious liability and apportionment of responsibility for employees who have more than one master. *See Reliance Nat'l Indem. Co. v. Advance'd Temporaries, Inc.*, 227 S.W.3d 46, 49 (Tex. 2007). The Texas Supreme Court "has long recognized that a general or regular employee of one employer may become the borrowed employee of another with respect to some activities." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex. 2002); *see also Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 70 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

If an employee of a general employer becomes the borrowed employee of

---

Energy. The trial court denied the requests and signed and dated the proposed questions. Via these exchanges, Priority adequately made the trial court aware of its complaint, timely and plainly, and obtained rulings on its requested questions as necessary to preserve error. *See* Tex. R. Civ. P. 274; *see also, e.g.*, *Smith-Hamm, Inc. v. Equip. Connection*, 946 S.W.2d 458, 463 (Tex. App.—Houston 1997, no writ).

another, he is no longer considered an employee of the general employer for liability purposes. *St. Joseph Hosp.*, 94 S.W.3d at 538. "[I]t is the shift of the right to direct and control the details of the work that transforms a general employee of one employer into a borrowed employee of another," thus rendering the new employer liable for the borrowed employee's actions. *Id.* at 542. Therefore, the essential inquiry under the borrowed employee doctrine is "which employer had the right of control of the details and manner of the employee's work." *Davis-Lynch, Inc.*, 472 S.W.3d at 70. This employer alone will bear liability for the employee's actions. *See id.*

Read together, the applicable standard of review and jurisprudence addressing the borrowed employee doctrine yield two principles: (1) the borrowed employee doctrine is applicable in circumstances where the plaintiff's theory of liability is dependent on the defendant's role as an employer, and (2) the defendant-employer is entitled to a borrowed employee jury question where that issue is supported by the pleadings and evidence. *See St. Joseph Hosp.*, 94 S.W.3d at 538, 542; *Mohammadi*, 656 S.W.3d at 858; *Indian Oil Co.*, 406 S.W.3d at 658. As shown below, both of these conditions were met here, thus entitling Priority to a jury question on the borrowed employee doctrine.

### B. Application

Our analysis begins with an examination of Chiles' theories of liability with respect to Priority. Chiles' live pleading as of the time of trial contains the following allegations:

- Mateo was a "joint employee" of Priority and EP Energy.

- Priority had a duty to supply EP Energy with "competent, qualified, and trained employees" and a duty "to ensure its employees were trained in and worked in compliance with Priority's own company

9

safety policies, the safety policies of EP Energy, and within the scope of [the] agreement made with EP Energy."

- The Priority employees on the job site "had a duty not to act negligently in the performance of their work."

- Priority and EP Energy are "vicariously liable for the negligent actions of [their] joint employees."

- Priority, "individually and as a joint employer," had a duty to "ensure that proper training and safety instructions were provided to Clay Mateo before he started to perform work for EP Energy."

- "Priority had a duty to properly train, supervise, and assign a mentor to Clay Mateo . . . while in the course and scope of his employment with Priority and EP Energy, as joint employers."

- Priority was "negligent in hiring Clay Mateo as an employee," including negligence with respect to "checking the background, experience, and job training of Clay Mateo."

- Priority was negligent in "training its employees for the tasks they would be performing and negligent in training and communicating the work tasks that Priority workers were not to perform on the EP Energy job site."

These allegations are premised on Priority's role as Mateo's employer, including the duties it owed with respect to Mateo's hiring, training, and supervision.

Second, the evidence at trial raised an issue of fact regarding whether Priority or EP Energy (or both) were responsible for directing and controlling the details of Mateo's work at the time of the incident. *See St. Joseph Hosp.*, 94 S.W.3d at 542; *Davis-Lynch, Inc.*, 472 S.W.3d at 70. Specifically, the jury heard the following:

- EP Energy and Priority had entered into a Master Service Agreement, pursuant to which Priority would provide EP Energy with lease operators and other employees, including Mateo. Under the terms of this agreement, Priority operated as an independent contractor and its

10

employees were "subject to [Priority's] sole and exclusive supervision, direction and control, and shall not be deemed, in fact or in law, to be employees of" EP Energy.[2]

- Greg Simms (EP Energy's worksite supervisor) testified that he instructed Mateo and Martinez to come to the Big Lake oil and gas processing facility the day of the incident.

- Simms said Mateo "worked for Priority" and, because Mateo was a short-service worker,[3] he should have had a mentor provided by Priority. Simms denied that he was Mateo's mentor.

- Simms testified that Mateo did not attend that day's JSA meeting nor did Mateo check in with Simms when he arrived at the jobsite. Simms said Mateo was not "following E.P. Energy safety policy on the job site when he opened that valve too early," causing pressurized fluid to shoot out of the end of the hose carried by Chiles.

- Mateo said he was hired by Priority in April 2014 to work as a lease operator. Mateo said he never transitioned from an employee of Priority to an employee of EP Energy. Mateo recalled watching training videos but did not know whether they were supplied by Priority or EP Energy.

- According to Mateo's testimony, Simms was his supervisor on the day of the incident and was "directing the work that day." Contrary to Simms' testimony, Mateo said he attended the day's JSA meeting, at which Simms went "step-by-step and explain[ed] . . . what was going to happen and who was going to do what."

- Troy Soileau, EP Energy's production supervisor, testified that he supervised Simms. According to Soileau, EP Energy supervises lease operators (like Mateo) and tells them "what they're supposed to do on a daily basis." Soileau said, when lease operators are working on a job site, "they're working exclusively for EP Energy."

---

[2] This contractual provision does not, as a matter of law, settle the borrowed employee question with respect to Priority and EP Energy. *See Exxon Corp. v. Perez*, 842 S.W.2d 629, 630 (Tex. 1992) (per curiam) (In the borrowed employee context, "[a] contract between two employers providing that one shall have the right of control over certain employees is a factor to be considered, but it is not controlling.").

[3] According to Simms' testimony, a short-service worker "[h]as less than six months employment with [the] current employer."

- Soileau said Simms was Mateo's mentor at the time of the incident. Soileau agreed that it "ultimately f[e]ll down to Greg Simms, the site supervisor, to make sure things were done properly."

- Todd Smith, EP Energy's safety specialist, testified that EP Energy had the "ultimate responsibility" on the job site. According to Smith, the person exercising that responsibility was Simms.

- Smith testified that Simms did not follow proper JSA procedure and failed to review the JSA with employees that arrived late to the work site, including Mateo. Smith said that "[c]ontrol of the site was lost and the expectations of — by the site leadership weren't met." Continuing on, Smith explained that, if Mateo "had reviewed the JSA," he would have known to "double, triple check the valves before doing any work."

- Preston Abbott, EP Energy's corporate representative, said Simms was responsible for "mak[ing] sure that the contractors that are there understand the policies and procedures set forth for that job." Abbott said it was an "error" for Simms to fail to review the JSA following Mateo's late arrival at the job site.

- Mitch Wilkerson, Priority's district manager, said EP Energy requested that Priority hire Mateo as a lease operator to work at an EP Energy job site. Wilkerson said Priority undertook a "standard background process" for these types of hires.

- Wilkerson said Priority supplied lease operators like Mateo with a vehicle and tools. Wilkerson testified that more "specific" tools would be provided by EP Energy.

- According to Wilkerson, Mateo's "supervisors were the people he worked for at EP."

- Donnie Audas, Priority's quality, safety, health, and environmental manager, testified that Mateo was required to follow both Priority and EP Energy policies. Audas said both companies' policies required Mateo to participate in job site safety meetings.

This evidence, taken together, raises an issue of fact regarding whether Priority or EP Energy controlled the details of Mateo's work at the time of the incident. *See St. Joseph Hosp.*, 94 S.W.3d at 542; *Davis-Lynch, Inc.*, 472 S.W.3d at 70. The

evidence indicates that EP Energy, via Simms, had significant control over the job site, including ensuring that the daily JSA meeting was undertaken with all employees and contractors on the site. But the evidence also shows that Priority was the entity that hired Mateo and provided him with some of the tools for his position. Moreover, according to the terms of EP Energy's and Priority's Master Service Agreement, Mateo was subject to Priority's "sole and exclusive supervision, direction and control."

Given this evidence and Chiles' theories of liability with respect to Priority, Priority was entitled to the submission of its borrowed employee jury question. *See St. Joseph Hosp.*, 94 S.W.3d at 538, 542; *Mohammadi*, 656 S.W.3d at 858; *Indian Oil Co.*, 406 S.W.3d at 658. Because this was a controlling factual issue that was supported by the pleadings and the evidence, the trial court abused its discretion by denying Priority's requested instruction. *See* Tex. R. Civ. P. 278; *Indian Oil Co.*, 406 S.W.3d at 658. Moreover, because a jury finding in Priority's favor on this issue would have insulated Priority from liability stemming from the underlying incident (*see St. Joseph Hosp.*, 94 S.W.3d at 538, 542), it constitutes reversible error that requires a new trial. *See Mohammadi*, 656 S.W.3d at 858.

We sustain Priority's first issue.

## C. Disposition

The trial court's failure to properly instruct the jury regarding Priority's borrowed employee issue warrants a new trial as to all claims and all parties for three reasons.

First, with respect to a partial remand, this court previously has stated: "If the reversible error affects part of, but not all of, the matter in controversy and that part can be separated ***without unfairness to the parties***, the judgment must be

13

reversed and a new trial ordered only as to the part affected by the error." *Ginn v. Pierce*, 595 S.W.3d 762, 768 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (emphasis added); *see also Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 166 (Tex. 1982) (although the supreme court found error only with respect to one defendant, it nonetheless reversed and remanded the entire case because the various claims were so intertwined that they could not be separated from the others without unfairness to the parties). Here, remanding for a new trial only on the borrowed employee issue would not be fair to all parties.

Rendering judgment on Chiles' claim against EP Energy and remanding for a new trial only on Priority's borrowed employee issue would exclude the party with the most to lose from subsequent proceedings: EP Energy. If the jury finds in Priority's favor on the borrowed employee question, Chiles nonetheless would be entitled to recover 100% of his damages from EP Energy based on the first jury's allocation of responsibility. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013(b)(1) (when the percentage of responsibility attributed to a defendant is greater than 50%, the defendant is jointly and severally liable for all damages recovered by the claimant). With nothing to lose, Chiles would not be compelled to mount a vigorous defense.

This stacks the deck in Priority's favor. With a jury finding in its favor on the borrowed employee issue, Priority would be insulated from liability with respect to Chiles' claims. This also would extinguish any right of contribution to which EP Energy may be entitled. *See id.* § 33.015(b) ("If a defendant who is jointly and severally liable pays a larger proportion of those damages than is required by his percentage of responsibility, that defendant has a right of contribution for the overpayment against each other defendant with whom he is jointly and severally liable under Section 33.013 to the extent that the other

14

defendant has not paid the proportion of those damages required by that other defendant's percentage of responsibility.").

Further, the factual issues inherent in a borrowed employee determination necessarily would bear on any allocation of responsibility between Priority and EP Energy. As laid out in the background section, this incident stems from Mateo's premature opening of the valve on the heater treater tank, which caused pressurized fluid to shoot out from the end of the hose Chiles was carrying. A borrowed employee question would require the jury to consider the extent to which Priority and EP Energy directed and controlled the details of Mateo's work — work that resulted in Chiles' injury. *See St. Joseph Hosp.*, 94 S.W.3d at 542. Similarly, a proportionate responsibility question asks the jury to assess the percentage of responsibility attributable to Priority and EP Energy for "causing or contributing to cause in any way the harm for which recovery of damages is sought[.]" *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). Because the jury foreseeably could have apportioned liability differently between Priority and EP Energy if it also found against Priority on the borrowed employee issue, a new trial on all claims is required. *See Builders Transp., Inc. v. Grice-Smith*, 167 S.W.3d 18, 20 (Tex. App.—Waco 2005, pet. denied) (per curiam) ("Appellees' claims against Landry and Builders Transport are significantly interwoven. So that a jury on remand will be able to apportion responsibility among all parties, we will reverse the judgment in its entirety and remand this cause to the trial court for further proceedings consistent with the opinion of this Court."); *see also, e.g., Diamond Offshore Drilling, Inc. v. Black*, 652 S.W.3d 463, 481-83 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *Heritage Hous. Dev., Inc. v. Carr*, 199 S.W.3d 560, 570 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Second, as a general rule, we can grant parties less relief than requested but

cannot grant more. *Zaidi v. Shah*, 502 S.W.3d 434, 445 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). In the portion of its appellate brief discussing the borrowed employee issue, Priority asked only that we "reverse the judgment of the district court and remand the case for a new trial with a borrowed employee instruction." Accordingly, consistent with Priority's request, it is appropriate to remand the case for a new trial as to all claims and all parties.

Finally, we have broad discretion to remand a case in the interest of justice after reversing the trial court's judgment. *See* Tex. R. App. P. 43.3(b); *Union Pac. R.R. Co. v. Seber*, 477 S.W.3d 424, 435 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "We may exercise our discretion to remand as long as there is a probability that the case, for any reason, has not been fully developed." *Union Pac. R.R. Co.*, 477 S.W.3d at 435. For the reasons discussed above, we conclude that the case has not been fully developed and that a new trial is appropriate. *See* Tex. R. App. P. 43.3(b).

## II.    Chapter 95

EP Energy filed a pretrial motion for summary judgment, asserting that Chiles' suit was governed by Chapter 95 and that Chiles could not raise an issue of fact with respect to the applicable burden of proof. Chiles also filed a pretrial summary judgment motion, arguing that EP Energy could not conclusively prove that Chapter 95 applies to his claims. In two orders, the trial court (1) denied EP Energy's summary judgment motion, and (2) granted Chiles' motion. On appeal, EP Energy asserts the trial court erred in its pretrial determination that Chapter 95 does not apply to this suit.

### A.    Standard of Review and Governing Law

We review the trial court's pretrial summary judgment *de novo*. *Tarr v.*

*Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018). We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). When, as here, both parties move for partial summary judgment on the same issue and the trial court grants one motion and denies the other, we "consider[] the summary judgment evidence presented by both sides, determine all questions presented, and if [we] determine that the trial court erred, render[] the judgment the trial court should have rendered." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

The movant for a traditional summary judgment must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

Chapter 95 was enacted in 1996 as part of a sweeping tort reform package and effected the legislature's recognition that "property owners often want to hire someone with expertise to repair or renovate some improvement on their property." *Oiltanking Houston, L.P. v. Delgado*, 502 S.W.3d 202, 208 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (internal quotation omitted). When a claim is governed by Chapter 95 as opposed to general common law principles, the claimant has a more difficult burden of proof. *Cox v. Air Liquide Am., LP*, 498 S.W.3d 686, 688 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. § 95.003. Moreover, if Chapter 95 applies, it presents the claimant's sole means of recovery. *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015).

17

Chapter 95 limits a property owner's liability when an independent contractor or its employee, hired to "construc[t], repai[r], renovat[e], or modif[y]" an improvement to the owner's property, brings a "claim for damages caused by negligence" that "arises from the condition or use" of that improvement. Tex. Civ. Prac. & Rem. Code Ann. §§ 95.001, 95.002. If a defendant meets its burden to conclusively establish these elements, a plaintiff cannot recover from a property owner unless it also can show that:

> (1) the property owner exercised or retained some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect or receive progress reports; and

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

*Id*. § 95.003; *see also Lopez v. Ensign U.S. S. Drilling, LLC*, 524 S.W.3d 836, 842 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (the burden is on the defendant to "prove[] Chapter 95 applies by presenting evidence conclusively establishing that all elements of section 95.002 have been met").

Chapter 95 appeals often involve issues of statutory construction, which we review *de novo*. *Abutahoun*, 463 S.W.3d at 46. We look to the plain meaning of the statute's words as an expression of legislative intent. *Id*. "If the statute is clear and unambiguous, we must read the language according to its common meaning without resort to rules of construction or extrinsic aids." *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389 (Tex. 2014) (internal quotation omitted).

Chapter 95 applies to all negligence claims that arise from either a premises defect or a property owner's negligent activity. *Abutahoun*, 463 S.W.3d at 50. Moreover, although Chapter 95 requires a causal connection between negligence

involving the improvement and the plaintiff's damages, this negligence need not be the "only cause" of the damages. *Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019).

## B.  Application

In the trial court and on appeal, EP Energy asserts that Chapter 95 applies to Chiles' negligence claim because (1) EP Energy was a "property owner"; (2) the heater treater tanks constituted "improvements to real property"; and (3) Chiles was hired to "repair[], renovate[], or modif[y]" the heater treater tanks. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.001.  Because we conclude that the summary judgment record fails to conclusively establish that Chiles was hired to repair, renovate, or modify the heater treater tanks, we need not address the other elements necessary to sustain the application of Chapter 95.

The legislature has not defined the terms "repairs," "renovates," or "modifies" as used in Chapter 95.  Several of our sister courts have given these terms their ordinary meaning:

1.  Repair — to restore to a good or sound condition after decay or damage; mend; to repair a motor; to restore or renew by any process of making good, strengthening, etc.: to repair one's health by resting.

2.  Renovate — to restore to good condition; to make new or as if new again; repair.

3.  Modify — to change somewhat the form or qualities of; alter partially.

*Vela v. Murphy Expl. & Prod. Co.-USA*, No. 04-18-00830-CV, 2019 WL 7196603, at *4 (Tex. App.—San Antonio Dec. 27, 2019, no pet.) (mem. op.) (quoting Webster's New Unabridged Dictionary 463, 1236, 1632 (2003)); *Morales v. Alcoa World Alumina L.L.C.*, No. 13-17-00101-CV, 2018 WL 2252901, at *7 (Tex. App.—Corpus Christi May 17, 2018, pet. denied) (mem. op.) (same); *Montoya v.*

*Nichirin-Flex, U.S.A., Inc.*, 417 S.W.3d 507, 512 (Tex. App.—El Paso 2013, no pet.) (same). As these definitions illustrate, Chapter 95 is intended to encompass actions that effect some change upon an improvement's condition, form, or qualities.

Case law further illustrates these definitions' applications. For example, in *Morales*, the court concluded that the plaintiff's work on pipes at an alumina refining facility fell within the definitions of "renovate" or "modify" because the work included (1) removing the pipe's solid blinds[4] and replacing them with open blinds, and (2) using a jackhammer to remove scale deposit that had collected on the pipes. 2018 WL 2252901, at *8. As the court reasoned, replacing the blinds "changed the form or qualities of the pipe" and using a jackhammer to remove scale "restored the [pipe] to a good, new condition." *Id.*

In *Rawson v. Oxea Corp.*, the court concluded that the plaintiff's work to replace damaged insulators[5] at an electrical substation constituted a "repair." 557 S.W.3d 17, 29 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd). As the court pointed out, the electrical substation "could not be fully operational without replacing the damaged insulators" and, accordingly, the plaintiff's work to replace the insulators restored the substation to a good or sound condition. *Id.* Similarly, in *Francis v. Coastal Oil & Gas Corp.*, the court held that a "coiled-tubing washout" on an oil and gas well qualified as either repair or renovation. 130 S.W.3d 76, 85 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In reaching this decision, the court noted that the purpose of the washout "was to rehabilitate the

---

[4] The court explained that "blinds" are "circular pieces of steel inserted between flanges" and used to "control the flow of caustic and process liquor" in various pipes. *Morales*, 2018 WL 2252901, at *1.

[5] As the court explained, "insulators" attach bare metal electrical conductors to a steel beam support structure that runs into a concrete foundation. *Rawson v. Oxea Corp.*, 557 S.W.3d 17, 20 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd).

20

well so that the flow of gas could increase." *Id.*

The court in *Montoya* examined whether the application of sealant coating to a building's roof fell within Chapter 95's purview. 417 S.W.3d at 511-14. Pointing out that the sealant was applied "to restore a primary function of the roof, namely, keeping water and other elements out of the building's interior," the court concluded that the activity "was not aimed at keeping the roof in an existing state." *Id.* at 512. Accordingly, the application of the sealant constituted "repairing" the roof under Chapter 95.

Finally, in *Martin v. WPP Properties, LLC*, the plaintiff worked at an apartment complex to perform "make ready" work on certain apartments, which included removing old tenant's belongings, painting, and replacing carpet. No. 12-20-00243-CV, 2021 WL 2816411, at *1 (Tex. App.—Tyler June 30, 2021, pet. denied) (mem. op.). The plaintiff fell while removing trash and other belongings from an apartment and sued the apartment on negligence and premises liability theories. *Id.* Concluding that the plaintiff's claim was governed by Chapter 95, the court reasoned that the plaintiff "was actively working for [the defendants] renovating apartments to make them ready for new tenants." *Id.* at *3.

In their applications of "repair," "renovate," and "modify," these cases illustrate a unifying principle: that the work at issue effected some type of change upon the improvement itself or its performance. But here, the summary judgment record does not make that showing with respect to the work Chiles was doing at the time of the incident. Specifically, the summary judgment evidence does not conclusively show that cleaning the heater treater tanks with a biocide mixture constitutes repairing, renovating, or modifying the tanks as necessary to fall within Chapter 95's purview.

With its summary judgment motion, EP Energy included as evidence

21

excerpts from Greg Simms' deposition. Describing the heater treater cleaning process, Simms said "we try to go and pull the bad water — the old water out of the bottom of the heater treaters because it just seems to sit there and gets stagnant and — and grow[s] bacteria. So we will pull the old water out of the bottom and push new water with biocide into the bottom." Simms said the biocide mixture would sit in the heater treater tank for approximately five hours. According to Simms, the biocide kept certain bacteria from growing in the water that could subsequently "eat holes" in the equipment.

With his summary judgment motion, Chiles attached deposition excerpts from Preston Abbott, EP Energy's corporate representative. Abbott also described the heater treater cleaning process and, in relevant part, testified as follows:

Q.	Now, over time in these particular heater treater tanks, they build up bacteria in the water; is that right?

A.	Yes, sir, they do.

Q.	And that has to be flushed out. It has to be killed — the bacteria?

A.	You would have to — you don't have to. But if you don't flush it out, the bac — the sulfate-reducing bacteria will eat — eat steel.

Q.	Right.

A.	It will — it will eat a hole into the fire tube, is usually where it first occurs.

Abbott said the heater treater cleaning process was undertaken approximately every quarter of a year or less frequently. According to Abbott, the biocide's sole purpose was to kill bacteria in the water; it would not do anything else to the heater treater tanks.

Continuing on, Abbott was questioned about the condition of the heater

22

treater tanks at the time they were being cleaned by Chiles. Abbott agreed that (1) there were no "malfunctions" with the heater treater tanks; (2) the tanks did not "need additional parts"; and (3) there was no "need for repairs" to the heater treater tanks. Abbott did not state that the cleaning was necessary to restore the heater treaters' functioning. Abbott agreed that this job was comprised of "chang[ing] the water out," which he described as a "[p]reventative maintenance kind of job."

Finally, both parties attached excerpts from Chiles' deposition, in which he discussed his role in the heater treater cleaning process. Chiles provided a description of the cleaning process similar to that given by Simms and Abbott and said he was "going to pump the biocide to let it mix around and then suck it out to be cleaned." Describing this process further, Chiles said the job required him to hook his tanker truck up to the heater treater tank via hoses, check the pressure on the hoses, and pump the biocide mixture into the tank.

Considered together and in the light most favorable to the nonmovant, we conclude that this evidence fails to conclusively establish that the heater treater cleaning process Chiles was undertaking when he was injured constituted repairing, renovating, or modifying the heater treater tanks. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.002(2). Specifically, the evidence does not conclusively show that anything was done to the tanks themselves but rather to the bacteria that grew in the *water*.

In contrast, the evidence analyzed in the cases cited above conclusively showed that the plaintiffs' work effected some type of change to the improvement or its output, thus constituting a repair, renovation, or modification. *See, e.g.*, *Martin*, 2021 WL 2816411, at *1, *3 (the plaintiff's work included physically removing trash and other belongings from apartments to ready them for new tenants); *Morales*, 2018 WL 2252901, at *8 (the plaintiff's work included

23

replacing pipe blinds and using a jackhammer to remove scale deposit); *Rawson*, 557 S.W.3d at 29 (the plaintiff was replacing damaged insulators, without which the electrical substation "could not be fully operational"); *Montoya*, 417 S.W.3d at 511-14 (the plaintiff applied sealant to a roof to "restore a primary function of the roof"); *Francis*, 130 S.W.3d at 85 (the plaintiff performed a "coiled-tubing washout" that "rehabilitate[d] the well so that the flow of gas flow could increase"). But here, both Simms and Abbott testified at their depositions that the biocide mixture killed bacteria in the water. Going further, Abbott confirmed that the biocide mixture would not do anything to the heater treater tanks themselves. Abbott also testified about the condition of the heater treater tanks at the time of the cleaning and said there was nothing wrong with the tanks' condition or output and no need for repairs. Rather, the job Chiles was performing was described as merely "chang[ing] the water out."

Accordingly, this evidence does not conclusively establish that Chiles was repairing, renovating, or modifying an improvement at the time of the incident as necessary to fall within the scope of Chapter 95. *See* Tex. Civ. Prac. & Rem. Code Ann. § 95.002(2). Therefore, the trial court did not err when it (1) denied EP Energy's partial motion for summary judgment on its Chapter 95 defense, and (2) granted Chiles' Chapter 95 summary judgment motion.

We overrule EP Energy's issue challenging these rulings.

CONCLUSION

We overrule EP Energy's issue challenging the trial court's pretrial rulings regarding Chapter 95's applicability. We sustain Priority's issue challenging the trial court's refusal to submit its borrowed employee jury question and, because of this error, remand the case for a new trial. In light of our disposition of this issue, we need not reach the other issues raised on appeal.

24

/s/      Meagan Hassan
Justice

Panel consists of Chief Justice Christopher and Justices Bourliot and Hassan (Christopher, C. J., concurring and dissenting).